# United States Court of Appeals for the Federal Circuit

---

**IN RE: DETROIT ATHLETIC CO.,**
*Appellant*

---

2017-2361

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 86625093.

---

Decided: September 10, 2018

---

KATHRYN R. SPRAY, Wright Beamer, Farmington Hills, MI, argued for appellant.

THOMAS L. CASAGRANDE, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA, argued for appellee Andrei Iancu. Also represented by CHRISTINA J. HIEBER, THOMAS W. KRAUSE, JOSEPH MATAL.

---

Before O'MALLEY, REYNA, and HUGHES, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Detroit Athletic Co. ("DACo") appeals from a decision of the Trademark Trial and Appeal Board affirming the Patent and Trademark Office's refusal to register DETROIT ATHLETIC CO. for sports apparel retail services. In that decision, the Board concluded that

DACo's mark is likely to be confused with the third-party mark DETROIT ATHLETIC CLUB, registered for clothing goods. *See In re Detroit Athletic Co.*, No. 86625093, 2017 WL 2876815 (T.T.A.B. June 2, 2017). Because the Board's conclusion is predicated on factual findings supported by substantial evidence, we affirm.

## I. BACKGROUND

DACo is a "sports specialty shop" that sells souvenirs and apparel associated with Detroit professional sports teams. J.A. 85. Since at least 2004, DACo has been using the DETROIT ATHLETIC CO. mark in connection with its retail services.

In May 2015, DACo filed an application to register the standard character mark DETROIT ATHLETIC CO. on the Principal Register for "[o]n-line retail consignment stores featuring sports team related clothing and apparel; [r]etail apparel stores; [r]etail shops featuring sports team related clothing and apparel; [r]etail sports team related clothing and apparel stores." *Detroit Athletic*, 2017 WL 2876815, at *1 & n.1. In response to a non-final refusal, however, DACo disclaimed ATHLETIC CO. and amended the application to seek registration on the Supplemental Register.

Thereafter, the examining attorney refused registration of the mark under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), finding that DETROIT ATHLETIC CO. is likely to be confused with DETROIT ATHLETIC CLUB, which is registered on the Principal Register for "[c]lothing, namely athletic uniforms, coats, golf shirts, gym suits, hats, jackets, sweat pants, sweat shirts, polo shirts, and T-shirts."[1] *Id.* at *1. The latter mark is owned by the Detroit Athletic Club, a private social club in Detroit originally "organized in 1887 as a place for men to

---

[1]    The wording ATHLETIC CLUB is disclaimed.

congregate and enjoy watching or participating in numerous sporting events." J.A. 66.

The Board affirmed, concluding that, "because the marks are similar, the goods and services are related, and the channels of trade and consumers overlap," consumers are likely to be confused by the marks. *Detroit Athletic Club*, 2017 WL 2876815, at *6. DACo appealed to this court, and we have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

## II. DISCUSSION

Under Section 2(d) of the Lanham Act, a mark may be refused registration if it "so resembles a mark registered in the Patent and Trademark Office[] . . . as to be likely, when used on or in connection with the goods of the applicant, to cause confusion[.]" 15 U.S.C. § 1052(d). Likelihood of confusion is a legal determination based on underlying findings of fact. *In re Viterra Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012). We review the Board's legal determination without deference and its factual findings for substantial evidence. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

In the Patent and Trademark Office—and in appeals therefrom—likelihood of confusion is determined by assessing the relevant factors set forth in *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973).[2]

---

[2] Those factors are: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-

*See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1338 (Fed. Cir. 2015). The *DuPont* factors deemed relevant by the Board in this case are: the (A) similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression (factor 1); (B) similarity or dissimilarity and nature of the goods or services as described in an application or registration (factor 2); (C) similarity or dissimilarity of established, likely-to-continue trade channels (factor 3); and (D) the length of time during and conditions under which there has been concurrent use without evidence of actual confusion (factor 8).

We address the Board's ruling with respect to each of these factors below.

A. Similarity or Dissimilarity of the Marks (Factor 1)

The first *DuPont* factor considers "[t]he similarity or dissimilarity of the marks in their entireties as to appear-

---

continue trade channels; (4) the conditions under which and buyers to whom sales are made—i.e., "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark (sales, advertising, length of use); (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time during and conditions under which there has been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used (house mark, "family" mark, product mark); (10) the market interface between applicant and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion—i.e., whether *de minimis* or substantial; and (13) any other established fact probative of the effect of use. *DuPont*, 476 F.2d at 1361.

ance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361. Here, the Board found that the DETROIT ATHLETIC CO. and DETROIT ATHLETIC CLUB marks "are nearly identical in terms of sound, appearance and commercial impression." *Detroit Athletic*, 2017 WL 2876815, at *2. That finding is supported by substantial evidence.

As the Board noted, both marks consist of three words beginning with the identical phrase "Detroit Athletic" and ending with one-syllable "C" words (i.e., "Co." and "Club"). *Id.* Both marks, moreover, conjure an image of sporting goods or services having a connection to Detroit. When viewed in their entireties, the marks reveal an identical structure and a similar appearance, sound, connotation, and commercial impression. These similarities go a long way toward causing confusion among consumers. *See In re Nat'l Data Corp.*, 753 F.2d 1056, 1060 (Fed. Cir. 1985) (finding similarity between CASH MANAGEMENT ACCOUNT and THE CASH MANAGEMENT EXCHANGE because they "are, in large part, identical in sound and appearance and have a general similarity in cadence"); *Van Pelt & Brown, Inc. v. John Wyeth & Bro., Inc.*, 161 F.2d 244, 246 (CCPA 1947) (finding similarity where both marks "have the same number of syllables, the suffix of each is pronounced the same, when spoken both have the same cadence and have a very little distinguishable difference in sound").

The identity of the marks' initial two words is particularly significant because consumers typically notice those words first. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (finding similarity between VEUVE ROYALE and two VEUVE CLICQUOT marks in part because VEUVE "remains a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 876 (Fed. Cir. 1992) (finding similarity

between CENTURY 21 and CENTURY LIFE OF AMERICA in part because "consumers must first notice th[e] identical lead word"). Indeed, in view of the marks' structural similarity, the lead words are their dominant portion and are likely to make the greatest impression on consumers. *See id.*; *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:42, at 23-245 (5th ed. 2018) ("It is appropriate in determining the question of likelihood of confusion to give greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer."). This likeness weighs heavily in the confusion analysis, and the Board did not err in so finding.[3]

DACo nevertheless argues that the Board failed to consider the marks in their entireties and instead emphasized the similarity between the marks' first two words while downplaying the differences between their terminal words. According to DACo, the differences engendered by the words "Co." and "Club" would allow consumers to distinguish between the marks. We disagree on both counts. First, the Board reiterated that it was assessing the marks "in their entireties" and proceeded to do just that. *Detroit Athletic*, 2017 WL 2876815, at *2; *see also id.* at *3 ("[V]iewed as a whole, the similarities between the marks in appearance, sound, connotation and commercial impression[] . . . outweigh the dissimilarities.").

---

[3]    The Board acknowledged that "the wording DETROIT ATHLETIC is itself conceptually weak" insofar as DETROIT is geographically descriptive and ATHLETIC is merely descriptive, but the Board nevertheless found that the identical wording at the beginning of the marks "lessens the possible influence of differing wording at the end." *Detroit Athletic*, 2017 WL 2876815, at *2. We see no reversible error in this finding.

Second, while it is true that the words "Co." and "Club" technically differentiate the marks, those words do little to alleviate the confusion that is likely to ensue. Both words are descriptive insofar as they merely describe the business form of the entity that owns the marks. *See Goodyear's Rubber Mfg. Co. v. Goodyear Rubber Co.*, 128 U.S. 598, 602–03 (1888) (noting that the addition of the word "Company" indicates only the business form of the entity); *cf.* McCarthy on Trademarks § 23:49, at 23-279 ("Tacking on a generic business entity name such as 'company,' or 'Inc.' or 'Partners' will not usually avoid a likelihood of confusion to an otherwise confusingly similar mark."). Indeed, both "Co." and "Club" were disclaimed in DACo's application and the Detroit Athletic Club's registration, respectively. *See* J.A. 33 (requiring DACo to disclaim ATHLETIC CO. "because such wording appears to be generic in the context of applicant's services").

Those words are therefore unlikely to change the overall commercial impression engendered by the marks. *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1266 (Fed. Cir. 2002) ("Given the descriptive nature of the disclaimed word 'Technologies,' the Board correctly found that the word 'Packard' is the dominant and distinguishing element of PACKARD TECHNOLOGIES."); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 947 (Fed. Cir. 2000) (finding similarity between LASER for golf clubs and golf balls and LASERSWING for golf practice devices, and noting that "the term 'swing' is both common and descriptive" and therefore "may be given little weight in reaching a conclusion on likelihood of confusion" (internal quotation marks omitted)); *cf.* McCarthy on Trademarks § 23:50, at 23-283 (merely adding "a generic, descriptive or highly suggestive term[] . . . is generally not sufficient to avoid confusion").

To be sure, the mere fact that "Co." and "Club" were disclaimed does not give one license to simply ignore those

words in the likelihood of confusion analysis. "This is so because confusion is evaluated from the perspective of the purchasing public, which is not aware that certain words or phrases have been disclaimed." *Shen Mfg. Co. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 1243 (Fed. Cir. 2004); *Nat'l Data*, 753 F.2d at 1059 ("The technicality of a disclaimer in National's application to register its mark has no legal effect on the issue of likelihood of confusion. The public is unaware of what words have been disclaimed during prosecution of the trademark application at the PTO." (footnote omitted)). Thus, the Board must consider the mark "in its entirety, including the disclaimed portion." *Viterra*, 671 F.3d at 1367.

But, "in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *Nat'l Data*, 753 F.2d at 1058. As described above, the non-source identifying nature of the words "Co." and "Club" and the disclaimers thereof constitute rational reasons for giving those terms less weight in the analysis. Thus, while it would be impermissible to ignore the words outright, the Board did not err in focusing on the other, more dominant portions of the marks. *See In re Dixie Rests., Inc.*, 105 F.3d 1405, 1407 (Fed. Cir. 1997) (finding that the dominant part of applicant's mark, THE DELTA CAFE, was the word "Delta" in part because the generic word "cafe" was disclaimed); McCarthy on Trademarks § 23:42, at 23-248 ("The fact that in a registration, certain descriptive or generic terms are disclaimed indicates that those terms are less significant and the other parts of the mark are the dominant parts that will impact most strongly on the ordinary buyer.").

This case is therefore distinguishable from *Juice Generation*, on which DACo relies. In that case, the Board found a likelihood of confusion between PEACE LOVE

AND JUICE for juice bars and PEACE & LOVE for restaurants. That conclusion was predicated on the Board's declaration that the "dominant portion" of the former mark was "virtually identical" to the latter mark, and its conclusory statement that "the additional disclaimed word 'JUICE' . . . do[es] not serve to sufficiently distinguish" the marks. 794 F.3d at 1341 (internal quotation marks omitted). We vacated that ruling, finding that the Board did not adequately consider whether the marks convey distinct meanings nor set forth an analysis showing that it in fact considered the disclaimed term. *See id.* In so ruling, however, we made clear that the Board "may properly afford more or less weight to particular components of a mark for appropriate reasons" as long as it "view[s] the mark as a whole." *Id.* As explained above, the Board here considered the marks as a whole. And, significantly, rather than simply dismissing "Co." and "Club" out-of-hand as in *Juice Generation*, the Board proffered rational reasons why those words, as mere business identifiers, do not sufficiently distinguish the marks.

Finally, the record evidence shows that, regardless of whether "Co." and "Club" were disclaimed, they do not serve source-identifying functions. Several third-party registrations proffered by the examining attorney, for example, establish that many clubs, including the Detroit Athletic Club itself, are corporations. This evidence suggests that "Co." and "Club" are not mutually exclusive. Thus, as the Board noted, the fact that an entity does business as a club does not foreclose its existence as a corporation. *See Detroit Athletic*, 2017 WL 2876815, at *2–3. The words "Co." and "Club" therefore do not distinguish the marks in the manner that DACo urges.[4]

---

[4] DACo attacks the third-party registrations, arguing that they use the terms "Co." and "Club" in ways

Substantial evidence thus supports the Board's finding that the marks are similar.

### B. Similarity or Dissimilarity and Nature of the Goods or Services (Factor 2)

The second *DuPont* factor considers "[t]he similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use." *DuPont*, 476 F.2d at 1361. Here, the Board found that the clothing goods described in the Detroit Athletic Club's registration are broad enough to cover "all types of clothing, which includes sports teams' clothing" sold by DACo. *Detroit Athletic*, 2017 WL 2876815, at *5. This finding, too, is supported by substantial evidence.

The services described in DACo's application relate to sports apparel and include "[o]n-line retail consignment stores featuring sports team related clothing and apparel; [r]etail apparel stores; [r]etail shops featuring sports team related clothing and apparel; [r]etail sports team related clothing and apparel stores." The clothing sold through those services is a subset of the goods described in the Detroit Athletic Club's registration, which include "[c]lothing, namely athletic uniforms, coats, golf shirts, gym suits, hats, jackets, sweat pants, sweat shirts, polo shirts, and T-shirts." Put another way, the Detroit Ath-

---

contrary to the terms' common meanings. DACo cites to a laundry list of evidence that it alleges is more probative of how consumers would perceive the marks at issue. But the third-party registrations were proffered merely to show that "club" trademarks can be owned by corporations, which refutes DACo's claim that the word "Club" tells the consumer that one entity is a club, while "Co." conveys that the other entity is a corporation. Accordingly, DACo's arguments on this point are unpersuasive.

letic Club's clothing goods are "very general" in nature and cover "all types of clothing," including the clothing sold through DACo's sports apparel retail services. *Detroit Athletic*, 2017 WL 2876815, at *4–5.

Thus, while the goods and services are not identical, they substantially overlap, which weighs in favor of finding a likelihood of confusion. *See Hewlett-Packard*, 281 F.3d at 1268 (finding confusion to be likely between HEWLETT PACKARD and PACKARD TECHNOLOGIES where "several of HP's registrations cover goods and services that are closely related to the broadly described services that Packard Press seeks to register"); *In re Hyper Shoppes (Ohio), Inc.*, 837 F.2d 463, 464 (Fed. Cir. 1988) ("[A]pplicant's 'general merchandise store services' would include the sale of furniture . . . . What else it sells is irrelevant; there is overlap.").

Indeed, the record evidence shows that several third-party apparel retailers—i.e., adidas, Hanes, Nike, and Puma—sell clothing bearing their own marks in addition to clothing bearing sports team names and logos. This evidence suggests that consumers are accustomed to seeing a single mark associated with a source that sells both its own branded clothing (as does the Detroit Athletic Club) as well as sports-teams-branded clothing (as does DACo). *See Hewlett-Packard*, 281 F.3d at 1267 (stating that evidence that "a single company sells the goods and services of both parties, if presented, is relevant to a relatedness analysis"); *In re Halo Leather Ltd.*, No. 2017-1849, 2018 WL 2974462, at *4 (Fed. Cir. June 13, 2018) (per curiam) (finding likelihood of confusion where the record evidence showed that "the goods come from the same sources under one mark" and that "consumers are accustomed to seeing the applied-for and registered goods originating from the same source"). In view of this evidence, the Board did not err in finding similarity between the respective goods and services.

DACo objects to this analysis, pointing out that DA-Co's application describes *services* in International Class 35, while the Detroit Athletic Club's registration describes *goods* in International Class 25. But that difference does not alter our conclusion. Classification is solely for the "convenience of Patent and Trademark Office administration," 15 U.S.C. § 1112, and "is wholly irrelevant to the issue of registrability under section 1052(d), which makes no reference to classification," *Jean Patou, Inc. v. Theon, Inc.*, 9 F.3d 971, 975 (Fed. Cir. 1993). It is therefore well established that "confusion may be likely to occur from the use of the same or similar marks for *goods*, on the one hand, and for *services* involving those goods, on the other." Trademark Manual of Examining Procedure ¶ 1207.01(a)(ii) (emphases added) (citing *Hyper Shoppes*, 837 F.2d at 464). Indeed, we have held that confusion is likely where one party engages in retail services that sell goods of the type produced by the other party, as here. *See Hyper Shoppes*, 837 F.2d at 464–65 (finding similarity between furniture and "general merchandise store services," and rejecting the distinction between goods and services as having "little or no legal significance"). Thus, that the goods and services at issue fall within different classes does not preclude a finding that they are similar.

DACo next argues that consumers would have little problem distinguishing between DACo's clothing store and the Detroit Athletic Club's private social club. While this may be true, it is largely irrelevant. The relevant inquiry in an ex parte proceeding focuses on the goods and services *described in the application and registration*, and *not* on real-world conditions. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 1325 (Fed. Cir. 2017) ("In reviewing the second factor, 'we consider the applicant's goods as set forth in its application, and the [registrant's] goods as set forth in its registration.'" (quoting *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 1382 (Fed. Cir. 2006)). DACo's arguments on this point are, thus, misdirected.

The registration for the DETROIT ATHLETIC CLUB mark describes *clothing*, not social clubs. The relevant inquiry, therefore, is whether consumers would believe that the Detroit Athletic Club—in its capacity as a *seller of clothes*—owns, sponsors, supplies, or is otherwise affiliated with DACo, a clothing store of a similar name. *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369 (Fed. Cir. 2012) ("[L]ikelihood of confusion can be found if the respective products are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." (internal quotation marks omitted)); *see also Giant Food, Inc. v. Nation's Foodserv., Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983) ("While we recognize that the average consumer makes a distinction between fast-food restaurants and supermarkets, we are satisfied that, if the marks themselves are confusingly similar, customers of the fast-food restaurant would be likely to believe that opposer owned, sponsored, or supplied that business."). As described above, the Board did not err by finding that consumers are in fact likely to conflate the source of the goods and services covered by the two marks at issue here.

Substantial evidence therefore supports the Board's finding that the goods or services associated with each mark are similar.

### C. Similarity of Trade Channels (Factor 3)

The third *DuPont* factor considers "[t]he similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 476 F.2d at 1361. The Board found that the Detroit Athletic Club's clothing comprises the type of goods likely to be sold through DACo's sports apparel retail services. *Detroit Athletic*, 2017 WL 2876815, at *5. Once again, this finding is supported by substantial evidence.

The registration contains no restrictions on the channels of trade or classes of customers. As a result, the Detroit Athletic Club's clothing is presumed to be sold in all normal trade channels to all the normal classes of purchasers. *See i.am.symbolic*, 866 F.3d at 1327 ("In the absence of meaningful limitations in either the application or the cited registrations, the Board properly presumed that the goods travel through all usual channels of trade and are offered to all normal potential purchasers."). The Board found that the "ordinary channels of trade for clothing items include all types of clothing stores, both online, and brick and mortar, including those that specialize in sports teams." *Detroit Athletic*, 2017 WL 2876815, at *5. In other words, the Board found that the Detroit Athletic Club's trade channels are broad enough to encompass DACo's. We see no reversible error in this finding.

DACo argues that the Detroit Athletic Club sells clothing only to its club members and only in its gift shop located onsite. DACo contends that this fact would prevent confusion among the public at large. Even if true, this assertion is, once again, irrelevant. The third *DuPont* factor—like the second factor—must be evaluated with an eye toward the channels specified in the application and registration, not those as they exist in the real world. *See i.am.symbolic*, 866 F.3d at 1325–27; *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 1323 (Fed. Cir. 2014) (stating with respect to the third *DuPont* factor that "[i]t was proper[] . . . for the Board to focus on the application and registrations rather than on real-world conditions, because the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application" (internal quotation marks omitted)). As described above, the registration does not set forth any restrictions on use and therefore "cannot be narrowed by testimony that the applicant's use is, in fact, restricted to

a particular class of purchasers." *Stone Lion*, 746 F.3d at 1323 (internal quotation marks omitted). Indeed, the owner of an unrestricted registration is entitled to change its current trade channels at any time. *See CBS Inc. v. Morrow*, 708 F.2d 1579, 1581 (Fed. Cir. 1983). Thus, we may not assume that the club will never sell clothing online or through third-party distributors.

To the extent DACo objects to the breadth of the goods or channels of trade described in the Detroit Athletic Club's registration, that objection amounts to an attack on the registration's validity, an attack better suited for resolution in a cancellation proceeding. *See* 15 U.S.C. § 1068 (stating that, in such proceedings, the Patent and Trademark Office may "modify the application or registration by limiting the goods or services specified therein"). "The present ex parte proceeding is not the proper forum from which to launch such an attack." *In re Calgon Corp.*, 435 F.2d 596, 598 (CCPA 1971); *see also Dixie Rests.*, 105 F.3d at 1408 (refusing to let an ex parte applicant narrow the scope of goods described in the cited registration).

Substantial evidence therefore supports the Board's finding that the trade channels for each mark overlap.

D. Evidence of a Lack of Actual Confusion (Factor 8)

Finally, the eighth *DuPont* factor considers "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion." *DuPont*, 476 F.2d at 1361. Here, DACo submitted evidence purporting to show a lack of actual confusion, including an affidavit of a long-time customer attesting to his history of purchasing goods from DACo, as well as Internet search results and online customer reviews for each company. The Board rejected this evidence, finding that it lacked probative value. *See Detroit Athletic*, 2017 WL 2876815, at *6. Substantial evidence supports the Board's findings.

As an initial matter, the relevant test is *likelihood* of confusion, not *actual* confusion. Thus, while evidence that the consuming public was not actually confused is legally relevant to the analysis, it is not dispositive. This is particularly true in the context of an ex parte proceeding. Likelihood of confusion in this context can be established even in the face of evidence suggesting that the consuming public was not actually confused. *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1317 (Fed. Cir. 2003) ("The lack of evidence of actual confusion carries little weight, especially in an *ex parte* context." (citation omitted)).

Further, DACo's evidence does not establish a lack of confusion. The customer affidavit on which DACo relies is just four sentences in length and states only that the customer had been purchasing clothing at DACo's store for the past sixteen years and understands that the word "Detroit" in DACo's name refers to Detroit sports teams rather than the location in which the clothing is made. J.A. 57. The affidavit does not, however, mention the DETROIT ATHLETIC CLUB mark, let alone suggest a lack of confusion between the two marks. The Internet search results and online reviews fare no better. The search results show that the two companies do not appear together in online searches but speak only to how the search engine's software processes the search terms. The online reviews reference consumers' experiences with one company or the other, but not both. Neither piece of evidence establishes a lack of consumer confusion in other, more commercially meaningful contexts.

Substantial evidence therefore supports the Board's finding that DACo's evidence purporting to show a lack of actual confusion was not sufficiently probative.

## E. Balancing the Factors

The Board balanced the *DuPont* factors and concluded that, "because the marks are similar, the goods and

services are related, and the channels of trade and consumers overlap, . . . confusion is likely between Applicant's mark DETROIT ATHLETIC CO. and the mark DETROIT ATHLETIC CLUB in the cited registration." *Detroit Athletic*, 2017 WL 2876815, at \*6. In view of the findings described above, we agree with this conclusion.

DACo argues that the Board erred by not addressing all *DuPont* factors for which evidence was proffered. We disagree. It is well established that the Board need not consider every *DuPont* factor. *See Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1355 (Fed. Cir. 2011) ("The T.T.A.B. is not required to discuss every *DuPont* factor and may find a single factor dispositive."); *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1164 (Fed. Cir. 2002) (noting that the likelihood of confusion analysis may focus "on dispositive factors, such as similarity of the marks and relatedness of the goods" (internal quotation marks omitted)). To the extent the Board did not expressly address each evidentiary item proffered by DACo pertaining to the Detroit Athletic Club's *actual* services, the Board was not required to do so; again, it is the scope of the club's registration that is relevant in this context, not its actual practices.

We therefore conclude that the Board did not err in balancing the relevant *DuPont* factors.

## III. CONCLUSION

We have considered DACo's remaining arguments and find them unpersuasive. Because substantial evidence supports each of the Board's factual findings, and those findings inevitably lead to the conclusion that DETROIT ATHLETIC CO. and DETROIT ATHLETIC CLUB are likely to be confused, we affirm the Board's ruling.

**AFFIRMED**

COSTS

No costs.