This Opinion is a
Precedent of the TTAB

Mailed: August 5, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*In re Ox Paperboard, LLC*
_____

Serial No. 87847482
_____

Scott F. Landis of Barley Snyder
    for Ox Paperboard, LLC.

Douglas A. Mondell, Trademark Examining Attorney, Law Office 127,
    Mark Pilaro, Managing Attorney.

_____

Before Lykos, Coggins and Johnson,
    Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

On March 23, 2018, Ox Paperboard, LLC ("Applicant") filed an application to

register on the Principal Register the composite mark displayed below



for "Paper tubes and cores; paperboards used for protective packaging; and recycled

paperboard" in International Class 16.[1]

Registration was refused under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's applied-for mark so resembles the registered standard character mark OX BOX (BOX disclaimed) on the Principal Register for "corrugated containers" in International Class 16 and "plastic and wooden containers for transportation of goods for commercial and industrial use" in International Class 20 as to be likely to cause confusion or mistake or to deceive.[2]

The appeal is briefed. We affirm.

## I. Amendment to the Identification of Goods

Before discussing the substance of this appeal, we address a preliminary issue raised in Applicant's brief. Applicant, without seeking leave or requesting remand, purports to amend the identification of goods from "Paper tubes and cores; paperboards used for protective packaging; and recycled paperboard" in International Class 16, to the following:

> "Paper tubes and cores; recycled paperboard; cardboard edge and package protectors for pallets and shipping; paper, conservation board, beermat, newsboard mounting board, manila paper, skin pack, mat boards; coasters of cardboard; cardboard for making or for use as coasters; colored paperboard; cap closure board in the nature of

---

[1] Application Serial No. 87847482, filed under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), alleging a bona fide intent to use the mark in commerce. The description of the mark is as follows: "The mark consists of a red shield outlined in black with the head of an ox outlined in white on top of the shield. The word 'OX' appears in black to the right of the shield. The shield and the wording 'OX' appear on a white background that is not claimed as a feature of the mark." The colors black, red, and white are claimed as a feature of the mark.

[2] Registration No. 2444121, registered April 17, 2001; renewed.

paperboard and cardboard; temporary protective flooring"
in International Class 16;

"Chipboard" in International Class 19; and

"Retail and wholesale store goods featuring Paper tubes and cores; recycled paperboard; cardboard edge protectors for pallets and packaging; paper, conservation board, beermat, newsboard mounting board, manila paper, skin pack preparation, processing and packaging applications); mat boards; coasters of cardboard; cardboard for making or for use as coasters; colored paperboard; cap closure board in the nature of paperboard and cardboard; temporary protective flooring; chipboard" in International Class 35.[3]

Applicant did not seek prior approval to amend the identification of goods and services. In his brief, the Examining Attorney objects on two bases: (1) that "Applicant did not amend, or attempt to amend, the identification of goods at any point during the prosecution of this application,"[4] and (2) that the proposed amendment is unacceptable because it exceeds the scope of the original identification.[5]

As a best practice, an applicant seeking to obviate a refusal by proposing an amendment to an application should propose the amendment as early as possible during prosecution.[6] If that does not occur, then the Board strongly prefers that an applicant make such an amendment in a request for reconsideration filed soon after the issuance of a final Office action but prior to the applicant's deadline for filing a

---

[3] Applicant's Brief, p. 9; 4 TTABVUE 10.

[4] Examining Attorney's Brief, 6 TTABVUE 5.

[5] *Id*. at 6 TTABVUE 6.

[6] To obviate a refusal, the best time to propose an amendment would be prior to the expiration of the time for filing a response to the final office action.

notice of appeal.[7] Doing so provides an opportunity for the issue to be addressed before the appeal stage. If an applicant has missed that opportunity, then the next preferred alternative is to file a separately captioned request for remand and suspension of proceedings with the Board, ideally prior to the deadline for filing an appeal brief, so that the Board can make a prompt ruling on the request and the examining attorney does not have to draft a potentially unnecessary appeal brief. If the Board decides to remand the application to the examining attorney, it will suspend the appeal for consideration by the examining attorney of an amendment which might obviate the refusal (and thus the appeal). Embedded amendments in an appeal brief are not prohibited but they are discouraged because they may be inadvertently overlooked by the Board before the Examining Attorney files his or her brief; if noticed, they may needlessly delay the proceeding. *See* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 1205.01 (2020) (proper procedure is to file a separately captioned request for remand because requests embedded in an appeal brief may not be noted by the Board).

In instances such as this where the Examining Attorney does not consent to a proposed amendment embedded in a brief but objects, the Board typically treats the proposed amendment as a request for remand for further examination, and considers whether good cause has been shown. *See id.* As explained in TBMP Section 1205.01, the standard for good cause is as follows:

---

[7] Trademark Rule 2.63(b)(3), 37 C.F.R. § 2.63(b)(3), permits an applicant to file a request for reconsideration *before* the deadline for filing an appeal to the Board.

> Good cause will generally be found, for example, when the amendment is an attempt to comply with a requirement, such as an amendment to the identification of goods or services in response to a requirement for an acceptable identification, when the amendment will obviate a ground for refusal, such as an amendment to the Supplemental Register or an amendment to assert a Trademark Act § 2(f) claim (15 U.S.C. § 1052(f) ) in order to avoid or overcome a refusal under Trademark Act § 2(e)(1), Trademark Act § 2(e)(2) or Trademark Act § 2(e)(4), 15 U.S.C. § 1052(e)(1), 15 U.S.C. § 1052(e)(2) or 15 U.S.C. § 1052(e)(4), or when the examining attorney consents to remand for consideration of the amendment. However, whether good cause will be found will depend, in part, on the stage of the appeal at the time the amendment is filed, including the reason given for the delay.

*Id.*

In this particular case, Applicant has failed to show the requisite good cause as to why the application should be remanded to the Examining Attorney for consideration of Applicant's amendment. At the outset, we emphasize that Applicant did not even request permission to amend its identification of goods; it merely presumed that it was entitled to assert a new identification in its brief and argue the substance of the appeal on this basis. Applicant offers no explanation as to why it waited until filing its brief to "propose" an amendment to its original identification. Moreover, as noted below in the discussion regarding the relatedness of the goods, even if Applicant's proposed amendment were accepted, it would not obviate the Section 2(d) refusal. Given the late stage of Applicant's "request" without any explanation for the reason for the delay, we find that Applicant has failed to demonstrate good cause to suspend the appeal and remand the application to the Examining Attorney for consideration of Applicant's proposed amendment and

further examination.[8] *See, e.g., In re Thomas White Int'l Ltd.*, 106 USPQ2d 1158, 1160 n.2 (TTAB 2013) ("at this late juncture applicant would not be able to show good cause" for a proposed amendment made in its appeal brief to expand the goods to cover related services after applicant previously deleted services from the application). Accordingly, the original identification of goods consisting of three items in International Class 16 remains the operative identification.

Applicant argues the substance of the appeal based on its proposed identification of goods and services in International Classes 16, 19 and 25. Had Applicant filed the proposed amendment in its Request for Reconsideration before filing a notice of appeal, or in a separately captioned request for remand before filing its brief, this issue could have been resolved in a timely manner prior to the issuance of this final decision. *See* TBMP § 1204 ("A timely request for reconsideration of an appealed action may be accompanied by an amendment and/or by additional evidence") and TBMP § 1209.04 ("Requests for remand are generally filed by applicants because they

---

[8] Under the guidance set forth in Section 1402.07(d) of the TRADEMARK MANUAL OF EXAMINING PROCEDURE (Oct. 2018), any further examination by the Examining Attorney would have to include the following:

> If the applicant submits an amendment to the identification of goods and services, and the examining attorney determines that it is unacceptable, in whole or in part, the examining attorney must advise the applicant of the item or items that are unacceptable. For those items which are unacceptable, the examining attorney should also advise the applicant that the previous items listed in the existing identification (not the unacceptable substitute) remain operative for purposes of future amendment. If portions of an amended identification are accepted, those items may not be further amended to exceed the scope of the accepted amendment.

wish to make additional evidence of record, or because they wish to amend the application."). Applicants before the Board are strongly encouraged to follow preferred practice in order to ensure the orderly administration of ex parte appeals.

## II. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E. I. DuPont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We must consider each *DuPont* factor for which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). When analyzing these factors, the overriding concerns are not only to prevent buyer confusion as to the source of the goods, but also to protect the registrant from adverse commercial impact due to use of a similar mark by a newcomer. *See In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the

marks."). These *DuPont* factors are discussed below.

## A. The Marks

This *DuPont* likelihood of confusion factor involves an analysis of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (citing *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC,* 126 USPQ2d 1742, 1746 (TTAB 2018), *aff'd mem.,* 777 F. App'x 516 (Fed. Cir. 2019) (citing *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1960 (TTAB 2016) (citing *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd per curiam*, 972 F.2d 1353 (Fed. Cir. 1992)).

Our analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on a comparison of the entire marks, not just part of the marks. *Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *In re Nat'l Data Corp.,* 753 F.2d

1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion.").

Applicant directs our attention to the obvious visual differences, observing that its mark is a composite mark consisting of stylized lettering as well as a design element consisting of the head of an ox on top of a shield. Applicant criticizes the Examining Attorney for focusing on the similarity of the shared wording OX, arguing that the design element in Applicant's mark as well as the additional word BOX in the cited registration suffice to overcome any likelihood of confusion.

Applicant's position is unconvincing. In considering the marks, we agree with the Examining Attorney's assessment that the word OX in both the applied-for and cited marks is dominant. Contrary to Applicant's assertion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *Stone Lion*, 110 USPQ2d at 1161 (citing *In re Nat'l Data Corp.*, 224 USPQ at 751).

Keeping this principle in mind, we observe that Applicant's and Registrant's marks are comprised, either in whole or in part, of the term OX which is arbitrary in relation to the identified goods. The literal portion of Applicant's and Registrant's mark is identical making them aurally similar. In the cited registration, OX is likely to be accorded more weight by consumers because the remaining wording, BOX, is,

at a minimum descriptive of Registrant's goods and has been disclaimed. *See, e.g., In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1050 (Fed. Cir. 2018) (citing *In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997)); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on likelihood of confusion.'") (quoting *In re Nat'l Data Corp.*, 224 USPQ at 751). As such, the word BOX is less likely to make an impact in the minds of consumers. *See In re Dixie Rests., Inc.*, 41 USPQ2d at 1533-34. *See also In re Nat'l Data Corp.*, 224 USPQ at 753.

In addition, we find that the design element in Applicant's mark is subordinate to the word OX. When a mark consists of a literal portion and a design portion, the literal portion is usually more likely to be impressed upon a purchaser's memory and to be used in calling for the goods or goods; therefore, the literal portion is normally accorded greater weight in determining whether marks are confusingly similar. *See, e.g., In re Viterra, Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1911 (Fed. Cir. 2012); *In re Dakin's Miniatures, Inc.*, 59 USPQ2d 1593, 1596 (TTAB 1999). *See also CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983); *In re Kysela Pere et Fils, Ltd.*, 98 USPQ2d 1261, 1267-68 (TTAB 2011). The principle is especially true here where the design element constitutes a pictorial representation of the sole word in Applicant's mark. The stylized depiction of an ox serves to reinforce the dominance of the literal element, not to detract from it. *See Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002) ("This design connotes a

crossword puzzle, which reinforces the connotation created by the words of the mark. Thus, the puzzle design does not convey any distinct or separate impression apart from the word portion of the mark. Rather, it serves only to strengthen the impact of the word portion in creating an association with crossword puzzles."); *see also In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1185 (TTAB 2018); *In re 1st USA Realty Professionals Inc.*, 84 USPQ2d 1581, 1586 (TTAB 2007) ("[B]ecause a stars motif is often associated with the United States, the stars design tends to simply reinforce the component USA in applicant's mark, rather than having a separate connotation or making a separate impression"); *In re Wilson*, 57 USPQ2d 1863, 1865 (TTAB 2001) ("[T]he illustration of pine cones merely reinforces the dominance of the arbitrary designation PINE CONE"); *In re N. Am. Free Trade Ass'n*, 43 USPQ2d 1282, 1288 (TTAB 1997) ("[T]he globe design featuring North America … reinforces that [the literal term] NAFTA is a reference to the treaty."); *In re Wine Society of Am.*, 12 USPQ2d 1139, 1142 (TTAB 1989) (finding that the "design features merely emphasize, in a pictorial way, the main word portion of the cited mark").

In sum, although we have pointed to the identical dominant portions of the marks, we acknowledge the fundamental rule that the marks must be considered in their entireties. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1134 (Fed. Cir. 2015); *Massey Junior Coll., Inc. v. Fashion Inst. of Tech.*, 492 F.2d 1399, 181 USPQ 272, 273-74 (CCPA 1974). We note the specific differences pointed out by Applicant. These differences, however, are outweighed by the similarities of the marks. Thus,

when comparing the marks overall, they are similar in sound, meaning, connotation and overall commercial impression. The similarity of the marks weighs in favor of finding a likelihood of confusion.

### B. The Goods

Next, we compare the goods as they are identified in the involved application and cited registration. *See In re Detroit Athletic Co.*, 128 USPQ2d at 1052; *Stone Lion*, 110 USPQ2d at 1161; *Octocom Sys., Inc. v. Hous. Comput. Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) and *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002). It is not necessary that the respective goods be identical or even competitive in order to find that they are related for purposes of our likelihood of confusion analysis. *In re Iolo Techs., LLC*, 95 USPQ2d 1498, 1499 (TTAB 2010); *In re G.B.I. Tile & Stone, Inc.*, 92 USPQ2d 1366, 1368 (TTAB 2009). The respective goods need only be "related in some manner and/or if the circumstances surrounding their marketing [be] such that they could give rise to the mistaken belief that goods emanate from the same source." *Coach Servs.*, 101 USPQ2d at 1722 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)). *See also In re Martin's Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289, 1290 (Fed. Cir. 1984); *In re Melville Corp.*, 18 USPQ2d 1386, 1388 (TTAB 1991).

Evidence of relatedness may include news articles or evidence from computer databases showing that the relevant goods are used together or used by the same purchasers; advertisements showing that the relevant goods are advertised together or sold by the same manufacturer or dealer; or copies of prior use-based registrations

of the same mark for both applicant's goods and the goods listed in the cited registration. *See, e.g., In re Davia*, 110 USPQ2d at 1817 (finding pepper sauce and agave related where evidence showed both were used for the same purpose in the same recipes and thus consumers were likely to purchase the products at the same time and in the same stores). The issue is not whether purchasers would confuse the goods, but rather whether there is a likelihood of confusion as to the source of these goods. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1439 (TTAB 2012); *In re Rexel Inc.*, 223 USPQ 830, 832 (TTAB 1984).

The cited registration covers two separate classes of goods; we focus on the corrugated containers in International Class 16. The record shows that Applicant's and Registrant's goods are complementary items used and sold together in packaging products for shipment. In support, the Examining Attorney submitted evidence from the following business-to-consumer (B2C) websites:

> ULINE offers for sale corrugated boxes, plastic containers, and paperboard tubes.[9]
>
> US Cargo Control offers for sale corrugated boxes and paperboard protectors.[10]
>
> Trim-Pac offers for sale corrugated boxes and paperboard for packaging.[11]

---

[9] July 13, 2018 Office Action, pp. 41-46, 49-50, 56-57. Citations to the prosecution history in the USPTO's Trademark Status & Document Retrieval ("TSDR") database are to the downloadable .pdf version. *See, e.g.*, *In re Peace Love World Live, LLC*, 127 USPQ2d 1400, 1402 n.4 (TTAB 2018).

[10] *Id*. at 134-44.

[11] April 8, 2019 Office Action, pp. 7-8.

Kyana Packaging Solutions offers for sale corrugated boxes and protective paperboard.[12]

Lancaster Packaging offers for sale corrugated boxes and paperboard flat mailers.[13]

GBE Packaging offers for sale corrugated mailing tubes and kraft mailing tubes.[14]

Riverside Paper Co. offers for sale mailing tubes and kraft tubes.[15]

Mil-Spec Packaging offers for sale corrugated boxes and paper tubes.[16]

This evidence shows that consumers may expect to find both Applicant's and Registrant's goods as identified in the involved application and cited registration as emanating from a common source.[17] This evidence is not from "big box" retail stores or online retailers selling a wide variety of goods, but rather from specialty retailers. This targeted type of retailing is narrower in scope, and the fact that more targeted sellers offer goods of both the Registrant and the Applicant tells us that the goods are related.

This evidence also shows that the products are used together to pack items meaning that they are complementary. In view of the foregoing, we find that the

---

[12] *Id.* at 9-19.

[13] *Id.* at 20-24.

[14] *Id.* at 25-28.

[15] *Id.* at 29-33.

[16] *Id.* at 34-38.

[17] Even if Applicant's proposed deletion of "paperboards used for protective packaging" had been accepted, the record still shows sufficient evidence of a relatedness between Applicant's two original remaining goods.

goods identified in the application and cited registration are related and complementary in nature. *Cf. In re Martin's Famous Pastry Shoppe, Inc.*, 223 USPQ at 1290 (holding bread and cheese to be related because they are often used in combination and noting that "[s]uch complementary use has long been recognized as a relevant consideration in determining a likelihood of confusion"). We therefore find relatedness of the goods supports a finding of a likelihood of confusion.

## C. Established, Likely-to-Continue Channels of Trade and Classes of Consumers

Lastly, we consider the established, likely-to-continue channels of trade and classes of consumers. Applicant maintains that the involved goods are marketed in distinct trade channels and directed to different consumers.

Applicant's argument is belied by the record evidence. Neither Applicant's nor Registrant's identifications contain limitations regarding intended users of their respective goods. In the absence of such restrictions, we cannot narrow the class of the intended purchasers. *See, e.g.*, *Detroit Athletic Co.*, 128 USPQ2d at 1052 ("the registration does not set forth any restrictions on use and therefore cannot be narrowed by testimony that the applicant's use is, in fact, restricted to a particular class of purchasers") (citation omitted). Likewise, insofar as there are no restrictions on trade channels, we must presume that the goods travel in all channels of trade appropriate for such goods, which as the record summarized above shows consists of entities specializing in the sale of packaging materials. *See In re Viterra*, 101 USPQ2d at 1908 (quoting *Hewlett-Packard Co. v. Packard Press, Inc.*, 62 USPQ2d at 1005). In addition, as mentioned in the preceding section, there is evidence that several

retailers offer products of both the Registrant and Applicant, which only reinforces the presumption. Accordingly, we find the channels of trade and classes of consumers overlap and this also favors a finding of likelihood of confusion.

### D. Balancing the Factors

We have carefully considered all of the evidence made of record, as well as all of the arguments related thereto. The similarities of the marks coupled with the related and complementary nature of the goods sold in overlapping trade channels to the same prospective consumers leads us to the conclusion that prospective consumers are likely to confuse the source of the involved goods. This is not a situation, as Applicant urges, where the marks are so "completely different"[18] as to obviate a likelihood of confusion. *See, e.g., Kellogg Co. v. Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991).

**Decision**: The Section 2(d) refusal is affirmed.

---

[18] Applicant's Brief, p. 10; 4 TTABVUE 11.