THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: February 13, 2024                                      Mailed: June 4, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*Iron Balls International Ltd.*
*v.*
*Bull Creek Brewing, LLC*

_____

Cancellation No. 92079099

_____

Jessica Bromall Sparkman and Rod S. Berman of Jeffer Mangels Butler & Mitchell
    LLP, for Iron Balls International Ltd.

John L. DuPré and Daniel A. Fleisher of Hamilton, Brook, Smith & Reynolds, P.C.,
    for Bull Creek Brewing, LLC.

_____

Before Greenbaum, Heasley, and English,
    Administrative Trademark Judges.

Opinion by Heasley, Administrative Trademark Judge:[1]

Respondent Bull Creek Brewing, LLC owns a Principal Register registration for

the mark IRON BALLS, in standard characters, for "beer," in International Class 32.[2]

---

[1] As part of an internal Board pilot citation program on broadening acceptable forms of legal citation in Board cases, this decision varies from the citation form recommended in the TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 101.03 (2023). This decision cites decisions of the U.S. Court of Appeals for the Federal Circuit and the U.S. Court of Customs and Patent Appeals by the page(s) on which they appear in the Federal Reporter (e.g., F.2d, F.3d, or F.4th). For decisions of the Board and the Director, this decision may cite to the WESTLAW (WL) or LEXIS legal database. As of the date of this decision, the pilot is ongoing, using various citation forms. Until further notice, practitioners should continue to adhere to the citation form recommended in TBMP § 101.03.

[2] Registration No. 4565000, issued July 8, 2014; renewed.

Petitioner Iron Balls International Ltd. seeks to partially cancel Respondent's registration under Trademark Act Section 18, 15 U.S.C. § 1068, by restricting Respondent's identification of goods from "beer" to "micro-brewed craft beer."[3] Petitioner claims that this restriction, if granted, will avoid a likelihood of confusion between Respondent's IRON BALLS mark and Petitioner's applied-for mark,



for "gin" in International Class 33.[4]

In its Answer, Respondent denied the salient allegations of the petition for partial cancellation.[5] Both parties submitted briefs and appeared at an oral hearing.

## I.   Entitlement to a Statutory Cause of Action

To establish entitlement to bring a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration or continued registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303-05 (Fed. Cir. 2020); *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1070

---

[3] Petition for Partial Cancellation, 1 TTABVUE.

[4] App. Ser. No. 97263328, filed February 11, 2022 on the basis of intent to use under Section 1(b), 15 U.S.C. § 1051(b), asserting a bona fide intent to use the mark in commerce. According to Petitioner's pending suspended application, "the mark consists of the phrase 'IRON BALLS' above the phrase 'ENGINERED ALCOHOL,' with a watermark behind the term 'IRON' consisting of a fanciful skull design with a crossed hammer and wrench and the phrase 'IRON BALLS ENGINEERED ALCOHOL' encircling the skull design." Color is not claimed as a feature of the mark.

[5] Answer, 4 TTABVUE.

(Fed. Cir. 2022); *Advance Mag. Publishers, Inc. v. Fashion Elecs., Inc.*, 2023 WL 4261426, at \*2 (TTAB 2023).

In this case, Petitioner has shown that its first application to register

**I R O N   B A L L S**
E N G I N E E R E D   A L C O H O L

(with "ENGINEERED ALCOHOL" disclaimed) for "gin," filed on January 12, 2017, was refused registration by the Trademark Examining Attorney based on a likelihood of confusion with Respondent's registered IRON BALLS mark for "beer." Petitioner appealed the refusal to the Board, which affirmed the refusal under Section 2(d), 15 U.S.C. § 1052(d), in a decision issued on January 16, 2019.[6]

Five years later, on Feb. 11, 2022, Petitioner filed its current pending application to register the same mark,

**I R O N   B A L L S**
E N G I N E E R E D   A L C O H O L

, for the same goods, "gin."[7] This application encountered the same initial refusal based on likelihood of confusion with Respondent's IRON BALLS mark for "beer,"[8] but was suspended due to Petitioner's Section 18 petition for partial cancellation, which Petitioner filed four days after its application, on February 15, 2022.[9]

---

[6] *In re Iron Balls Int'l*, Serial No. 87299536, 2019 WL 646091 (TTAB 2019) (nonprecedential), 17 TTABVUE 3-17.

[7] App. Ser. No. 97263328.

[8] 10 TTABVUE 17-73.

[9] May 25, 2023 Office Action suspending Application Ser. No. 97263328, 20 TTABVUE 137-38.

Petitioner's evidence that its pending trademark application has been refused registration based on Respondent's registration demonstrates that Petitioner has a real interest in the proceeding and a reasonable belief that it would be damaged by the continued unrestricted registration of Respondent's mark, thus establishing its entitlement. "A petitioner may demonstrate a real interest and reasonable belief of damage where the petitioner has filed a trademark application that is refused registration based on a likelihood of confusion with the mark subject to cancellation." *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1375 (Fed. Cir. 2020); s*ee Covidien LP v. Masimo Corp.*, 2014 WL 977444, at *2-3 (TTAB 2014) (standing to seek relief under Section 18).

At oral argument, Respondent did not dispute Petitioner's entitlement to bring this proceeding under Section 18.

## II.   The Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of the registration sought to be restricted, Reg. No. 4565000 for the mark IRON BALLS for "beer."

In addition, **Petitioner** introduced:

• The declarations of Romain Ambrunn, a director and partner of Petitioner, and Philippe Bramaz, a partner and shareholder of Petitioner (8 TTABVUE, 9 TTABVUE);

● Petitioner's notice of reliance on: Ser. No. 97263328 for IRON BALLS ENGINEERED ALCOHOL & design and a portion of the application file associated therewith (10 TTABVUE 17-73); Third-party registrations identifying craft beers and

microbrew beers (10 TTABVUE 75-181); Petitioner's discovery requests and Respondent's responses thereto (10 TTABVUE 182-292); Printed publications from The Brewers Association, containing information about the meaning of craft and micro-brewed beer, segments of the craft beer industry, and Respondent's membership in that association (10 TTABVUE 294-314); Printouts from the current and prior versions of Respondent's website (10 TTABVUE 315-317, 321-330); Information about the Internet Archive (10 TTABVUE 319-320); Articles and information about Respondent (10 TTABVUE 331-340); Articles relating to the nature of craft and micro-brewed beer (10 TTABVUE 342-350, 414-443); Dictionary definitions regarding the meaning of "craft beer," "craft brewery," "microbrewery," and "micro-brewed beer" (10 TTABVUE 352-412); and Excerpts from The New Brewer: The Journal of the Brewers Association, (Vol. 39, No. 3, May/June 2022) about craft brewers and microbreweries (10 TTABVUE 445-459).

**Respondent** introduced:

• The declaration of Erick Matthys, Respondent's owner and founder, with exhibits (16 TTABVUE);

• Respondent's notice of reliance (15 TTABVUE) on:[10] The Board's decision in *In re Iron Balls Int'l*, Serial No. 87299536, 2019 WL 646091 (TTAB 2019) (17 TTABVUE 3-17); Petitioner's Application Ser. No. 87299536 application file (19 TTABVUE); Petitioner's Application Ser. No. 97263328 application file (20 TTABVUE 135-238);

---

[10] Respondent re-introduced some evidence that Petitioner made of record during its trial period. This was unnecessary and unhelpful. Once evidence is properly introduced it may be relied on by any party for any purpose permitted under the Federal Rules of Evidence. Trademark Rule 2.122(a), 37 C.F.R. § 2.122(a).

Petitioner's applications to register IRON BALLS for other goods not at issue here (17 TTABVUE 19-77, 20 TTABVUE 1-133); Anheuser-Busch websites (17 TTABVUE 79-106); Department of Treasury "Number of Brewers by Production Size – CY 2021" (17 TTABVUE 108); Documents relating to Ser. No. 87299536 and portions of the application file therefor; websites from or about brewers and distillers (17 TTABVUE 110-130); and website articles about beer, craft beer and micro-brew beer (17 TTABVUE 132-181).

In rebuttal, **Petitioner** introduced:

- Petitioner's rebuttal notice of reliance on: USPTO records of third-party registrations identifying both beer and distilled spirits, but cancelled (22 TTABVUE 6-47); websites and USPTO records relating to third parties purportedly using the same mark for both beer and distilled spirits (22 TTABVUE 48-394).

## III. Discussion

### A. Section 18 of the Trademark Act

Section 18 of the Trademark Act provides that "the Director may ... restrict or rectify with respect to the register the registration of a registered mark...." 15 U.S.C. § 1068. This Section "gives the Board the equitable power to, inter alia, restrict the goods or services identified in an application or registration." *Embarcadero Techs., Inc. v. RStudio, Inc.*, 2013 WL 2365029, at *2 (TTAB 2013) (internal punctuation omitted). The primary purpose of a Section 18 amendment is to avoid a likelihood of confusion by restricting a broad identification to the specific type of goods or services for which the mark is actually used, or by restricting the channels of trade to those in which the goods or services actually travel. *See generally Eurostar v. "Euro-Star"*

*Reitmoden GmbH & Co. KG*, 1995 WL 231387 (TTAB 1994). A party seeking to restrict a registrant's broadly worded identification of goods under Section 18 must plead and prove "(1) that the registrant is not using its mark on goods or services that would be excluded by the limitation, and (2) that the limitation would result in the avoidance of a finding of a likelihood of confusion." *Wellcome Found. Ltd. v. Merck & Co.*, 1998 WL 239299, at *2 (TTAB 1998) (citing *Eurostar*, 1995 WL 231387), *cited in Orange Bang, Inc. v. Ole Mexican Foods, Inc.,* 2015 WL 5675641, at *9 (TTAB 2015); *Sage Therapeutics, Inc. v. SageForth Psych. Servs., LLC*, 2024 WL 1638376, at *15-17 (TTAB 2024); *see generally* TBMP § 309.03(d).

### B. Summary of the Parties' Arguments

Petitioner contends that restricting Respondent's identification of goods from "beer" to "micro-brewed craft beer" accurately identifies Respondent's goods and avoids a likelihood of confusion with Respondent's IRON BALLS mark:

> Micro-brewed craft beers come from breweries with very limited production, and only a handful of the nearly 9,000 such breweries in the United States are also offering gin. Even though both parties' marks include the term IRON BALLS, [because of] the differences in the parties' goods, channels of trade and distribution, and the limited strength of Respondent's Mark, consumers are simply not likely to believe that a craft micro-brewery is also producing "gin."[11]

Respondent counters with three arguments. First, it maintains, the petition to restrict Respondent's identification of goods is barred by collateral estoppel. When Petitioner's first application was finally refused registration, it appealed to the Board, which affirmed the refusal, and Petitioner did not seek further court review of that Board decision. Respondent concludes that this satisfies the elements of collateral

---

[11] Petitioner's brief, 24 TTABVUE 5.

estoppel, or issue preclusion, as the issue of likelihood of confusion was raised, litigated, and necessarily determined in the prior Board proceeding, at which Petitioner had a full and fair opportunity to litigate the issue. As the issue "has already been adjudicated by the TTAB, Petitioner may not further pursue the matter by a separate action arising out of a duplicative trademark application," Respondent concludes. "Accordingly, allegations in the present Petition for Partial Cancellation are barred by the doctrine of collateral estoppel."[12]

Second, Respondent argues:

> Registrant's goods are properly described as "beer." The modifiers sought to be added to the description of goods for the [subject Registration] include a term (i.e., "micro-brewed") that is erroneous with respect to Registrant's goods, and a term (i.e., "craft") that has no meaningful definition, imparts no commonly-accepted standard, and is quickly falling out of use in the industry.[13]

Third, Respondent maintains, Petitioner's proposed limitation does not avoid a finding of likelihood of confusion, as the marks, channels of trade, and purchasers would still be similar, and Respondent's mark would remain strong.[14] For these reasons, Respondent concludes that the Petition to restrict its identification of goods should be denied.

## C. Whether Petitioner's Claim is Barred by Collateral Estoppel (i.e., Issue Preclusion)

> Sometimes two different tribunals are asked to decide the same issue. When that happens, the decision of the first tribunal usually must be followed by the second, at least if the issue is really the same. Allowing the same issue to be decided more than once wastes litigants' resources and adjudicators' time, and it encourages parties who lose before one tribunal

---

[12] Respondent's brief, 25 TTABVUE 11.

[13] Respondent's brief, 25 TTABVUE 19.

[14] Respondent's brief, 25 TTABVUE 12-17.

to shop around for another. The doctrine of collateral estoppel or issue preclusion is designed to prevent this from occurring.

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 140 (2015).

The Trademark Act provides that estoppel, like other equitable principles, may be considered and applied where applicable. 15 U.S.C. § 1069. "Agency adjudications at the USPTO are entitled to res judicata and collateral estoppel effect." *In re Vox Populi Registry Ltd.*, 25 F.4th 1348, 1352 n.2 (Fed. Cir. 2022) (citing *B&B v. Hargis*, 575 U.S. at 160). The Board has accordingly applied res judicata based on a prior ex parte decision to prevent an applicant from registering the same mark for the same goods or services where there was no change in circumstances. *In re Solarwindow Tech., Inc.*, 2021 WL 877769 (TTAB 2021).

More to the point, the Board has applied the doctrine of issue preclusion in an inter partes proceeding following an ex parte proceeding in which a refusal of the applicant's prior application for the same mark and goods or services was affirmed. *Lukens Inc. v. Vesper Corp.*, 1986 WL 83308, at *2 (TTAB 1986) ("The underlying rationale is that a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again."). In that case, as in this, the Board noted that:

> the prior proceedings were ex parte in nature. We do not believe, however, that this fact negates the preclusive effect of the prior judgment under the circumstances of this case. Although opposer was a stranger to the prior ex parte proceedings, opposer should be permitted to offensively plead issue preclusion as to functionality since, in our mind, applicant had a "full and fair opportunity" to litigate the issue of functionality in the ex parte proceedings. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 … (1971); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979); and *State of Montana v. United States*, 440 U.S. 147 (1979).

*Id.* at \*3, *cited in In re Anderson*, 2012 WL 680264, at \*4 (TTAB 2012). McCarthy agrees that "Under the modern view even a defendant not a party to the first case can invoke collateral estoppel as a defense." 6 J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:83 (5th ed. Dec. 2023).

The doctrine of issue preclusion is applicable in the present case with respect to one issue: the comparison of the marks. The prior ex parte appeal (1) presented an identical issue of confusingly similar marks, which was (2) actually litigated and (3) necessarily determined, and (4) the party defending against preclusion, Petitioner, had a full and fair opportunity to litigate the issue. *See Montana v. United States*, 440 U.S. 147, 153-55 (1979); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1371 (Fed. Cir. 2013); *Stephen Slesinger Inc. v. Disney Enters. Inc.*, 702 F.3d 640, 644 (Fed. Cir. 2012); *Valvoline Licensing & Intell. Prop. LLC v. Sunpoint Int'l Grp. USA Corp.*, 2021 WL 3164036, at \*3 (TTAB 2021).

The doctrine must, however, be applied with caution. "Caution is warranted in the application of preclusion by the PTO, for the purposes of administrative trademark procedures include protecting both the consuming public and the purveyors." *Mayer/Berkshire Corp. v. Berkshire Fashions Inc.*, 424 F.3d 1229, 1234 (Fed. Cir. 2005). Issue preclusion "serves, in certain circumstances, to bar the revisiting of 'issues' that have been already fully litigated." *Levi Strauss v. Abercrombie & Fitch*, 719 F.3d at 1371 (internal citation and punctuation omitted). It does not bar issues of fact and law that were not litigated and determined in the prior proceeding. *Id.*

Here, while the prior comparison of marks remains the same, the Petition for partial cancellation of Respondent's registration raises new issues that were neither

litigated nor determined in the prior ex parte appeal: whether restricting Respondent's identification of goods from "beer" to "micro-brewed craft beer" accurately describes Respondent's goods, and whether this restriction would avoid a likelihood of confusion between the parties' marks.

The restriction would not affect the first *DuPont* factor, comparison of the parties' marks, as they are the same marks addressed in the prior ex parte Board decision, and there is no evidence that the proposed restriction would affect the relevant public's perception of the marks themselves.[15] The doctrine of issue preclusion applies to bar relitigation of the similarity of the marks.

However, Petitioner's proposed restriction of goods raises new issues as to other *DuPont* factors. In the prior ex parte decision, the Board considered the relatedness of Petitioner's "gin" and Respondent's "beer," explaining that "Registrant's identification is not limited to craft beer; registrant's goods are considered to include all types of beer sold through all normal channels of trade."[16] In assessing Petitioner's Section 18 claim, we must consider precisely the issue we did not decide in the ex parte proceeding, namely, whether "gin" is related to "micro-brewed craft beer." As Petitioner argues, its proposed restriction from "beer" to "micro-brewed craft beer" could also affect other *DuPont* factors, such as the channels of trade, the relevant consumers' sophistication and care, the commercial strength of Respondent's mark, and the extent of potential confusion. The doctrine of issue preclusion does not bar litigation of these issues.

---

[15] *In re Iron Balls Int'l*, 2019 WL 646091, 17 TTABVUE 6-9.

[16] *Id.*, 17 TTABVUE 15.

In sum, we find that issue preclusion bars relitigation of the first *DuPont* factor (although, for the sake of completeness, we will go over the Board's previous decision on this issue), but does not bar litigation of whether Respondent's goods are "micro-brewed craft beer" and whether this proposed restriction would affect other *DuPont* factors, thereby avoiding a likelihood of confusion.

### D. Whether Respondent's Goods are "micro-brewed craft beer"

To show that its proposed restriction, "micro-brewed craft beer," is an accepted term for a type of beer, recognized by the USPTO, Petitioner submits printouts of 34 Principal Register registrations identifying "craft beer" and "micro-brewed beer."[17]

### Craft Beer

To show that Respondent Bull Creek Brewing is a craft brewery, brewing craft beer, Petitioner submits the following evidence: Respondent sought certification as an independent craft brewery from the Brewers Association, a nonprofit trade association for the beer brewing industry.[18] Respondent met the Brewers Association's definition of a "craft brewer": it is (1) small, producing less than six million barrels of beer a year, (2) independent, and (3) a brewer that has received a Brewer's Notice from the Alcohol and Tobacco Tax and Trade Bureau.[19] It thus obtained the right to use the Brewers Association's Independent Craft Brewer Seal:

---

[17] Petitioner's notice of reliance (NOR), exs. 2-34, 10 TTABVUE 74-181; ex. 36, Respondent admits that the Trademark Office accepts "craft beer" as an acceptable identification of goods. Respondent's Response to Request for Admission no. 23, 10 TTABVUE 195.

[18] Petitioner's NOR ex. 41, Brewers Association website, 10 TTABVUE 294.

[19] Petitioner's NOR ex. 42, Brewers Association website (brewersassociation.org), 10 TTABVUE 298, ex. 50, 10 TTABVUE 348; "What is a Craft Brewery?" (CraftBeer.com) ex. 64, 10 TTABVUE 442.



[20]

According to The Brewers Association website, "[t]he independent craft brewer seal is a certification mark confirming your brewery has a valid TTB Brewer's Notice and meets the Brewers Association's definition of a U.S. craft brewer."[21] "The seal sends a 'clear message to the beer drinker' that a beer is made by a small and independent brewer, explains Brewers Association Director Paul Gatza."[22]

Respondent paid dues as a member of the Brewers Association's smallest beer production category: zero to 500 barrels per year.[23] And it received the Brewers Association's license to use the independent craft brewer seal,[24] which it displays on its products.[25] For example:

---

[20] Petitioner's NOR ex. 41, Brewers Association website (brewersassociation.org), 10 TTABVUE 304.

[21] Petitioner's NOR ex. 41, Brewers Association website, 10 TTABVUE 304.

[22] Petitioner's NOR ex. 64, "What is a Craft Brewery?" (Craftbeer.com), 10 TTABVUE 443.

[23] Petitioner's NOR ex. 43, Brewers Association website, 10 TTABVUE 312.

[24] Petitioner's NOR ex. 43, 10 TTABVUE 307-311.

[25] "Bull Creek Brewing is a member of the Brewers Association and carries the association's Independent Craft Brewers seal on its products." Matthys decl. ¶ 30, 16 TTABVUE 9. "Registrant responds that it has used the Brewers Association Independent Craft Brewer Seal." Petitioner's NOR, ex. 40, Respondent's Ans. to Int. 30, 10 TTABVUE 274.




In its discovery responses, Respondent states that it meets the Brewers Association requirements for being a 'craft brewer,' and that it has obtained the right to use the Brewers Association Independent Craft Brewer Seal.[28]

Nonetheless, Respondent takes the position that:

> while the Brewers Association sets forth a definition of a "craft brewer" for the purposes of membership in its organization, there is no standard definition of a "craft beer" in the industry. The term "craft" with respect to beer had initially been adopted to indicate that the beer was produced using higher-quality ingredients and/or in small batches. However, given

---

[26] Matthys decl. ex. 14, 16 TTABVUE 83.

[27] Matthys decl. ex. 3, 16 TTABVUE 26.

[28] Petitioner's NOR, Respondent's Ans. to Int. 29, 32, 10 TTABVUE 273, 275.

the ubiquity of the term "craft" with respect to beer on the market today, the term is now antiquated.[29]

Respondent points to the multiplicity of diverging dictionary definitions of "craft beer" proffered by Petitioner:[30]

- "A distinctively flavored beer that is brewed and distributed regionally. Also called craft brew, microbrew." —American Heritage Dictionary.[31]

- "An all-malt or nearly all-malt specialty beer usually brewed in a small, regional brewery." —Dictionary.com.[32]

- "A specialty beer produced in limited quantities: microbrew." —Merriam-Webster Dictionary.[33]

- "A beer made in a traditional or non-mechanized way by a small brewery" — Lexico.com.[34]

- "Craft beer is a beer that has been made by craft breweries. They produce smaller amounts of beer, typically less than large breweries, and are often independently owned. … . The definition is not entirely consistent but typically applies to relatively small, independently owned commercial breweries that employ traditional brewing methods and emphasize flavor and quality." —

---

[29] Matthys decl. ¶ 33, 16 TTABVUE 9-10. *See* Respondent's Notice of Reliance (NOR) ex. 15, *What is the Definition Of Craft Beer?* Vinepair.com, "[D]efining craft beer is hard to do." 17 TTABVUE 148; ex. 16, *Why Did People Stop Saying 'Microbrew' And Start Calling it 'Craft Beer'?* FoodRepublic.com, "It's the same fate that befell 'micro-brewery.' Smaller breweries in the U.S. make such a wide variety of beers in myriad styles with an unprecedented array of ingredients and techniques that 'craft' just doesn't do it anymore — or, at least, it does it better than 'micro,' but it's just kind of pointless given the diversity out there." 17 TTABVUE 158; ex. 17, *How Craft Became Craft*, AllAboutBeer.net, "When consumers tour the Dogfish Head brewery, one of the first things they hear is the Brewers Association definition of craft beer." 17 TTABVUE 169; ex. 18, *What is craft Beer, Really?* WineMag.com, (addressing the evolution of the term "craft beer").

[30] Respondent's brief, 25 TTABVUE 18.

[31] Petitioner's NOR, AHDictionary.com, ex. 51, 10 TTABVUE 353.

[32] Petitioner's NOR, Dictionary.com, ex. 54, 10 TTABVUE 360.

[33] Petitioner's NOR, Merriam-Webster.com, ex. 55, 10 TTABVUE 368.

[34] Petitioner's NOR, Lexico.com, ex. 57, 10 TTABVUE 381.

Wikipedia.[35]

Indeed, a site Petitioner quotes notes that:

> Craft brewing is the pursuit of small, independent commercial breweries, making beer by largely traditional means and with largely traditional ingredients, with the goal of making beer that is far more flavorful than the common brands made by large international breweries. As is often the case with cultural movements, **there is no single definition of the terminology upon which everyone will agree**.[36]

Petitioner correctly observes, however, that "[a]lthough the definitions are not identical, and although they use different language to do so, they all define 'craft beer' as coming from … small regional or limited production breweries. … And the evidence also establishes that Respondent fits squarely within all of the definitions of 'craft beer' and 'craft brewing' reflected in the record."[37] "[A]ny argument that Respondent is not a craft brewery – and that its beer is not 'craft beer' – is foreclosed by Respondent's representations that it is a craft brewery and its use of the Independent Craft Brewer Seal."[38] On consideration of all the evidence, we agree with this analysis, and find that Respondent's beer is craft beer.

**Microbrewed Beer**

Petitioner's contention that Respondent's beer is "microbrewed" is also correct—insofar as Respondent produces a small, limited output of beer.

The Brewers Association treats microbreweries as a subset of craft brewers:

---

[35] Petitioner's NOR, ex. 61 en.wikipedia.org, 10 TTABVUE 394-95.

[36] Petitioner's NOR, BeerAndBrewing.com/dictionary ex. 59, 10 TTABVUE 385 (emphasis added).

[37] Petitioner's reply brief, 26 TTABVUE 7-8.

[38] Petitioner's brief, 24 TTABVUE 9.



The Brewers Association defines a "microbrewery" as "[a] brewery that produces less than 15,000 barrels of beer per year and sells 75 percent or more of its beer off site."[40] This dual qualification has been recognized in some articles about the industry. For example: "A microbrewery is classified by the number of beer barrels it produces in a year, which is a limit of 15,000 barrels of beer per year, and at least 75 percent of that beer must be sold outside of the brewery."— CraftBeerClub.com.[41]

Respondent admits that it produces fewer than 15,000 barrels of beer per year.[42] In fact, as noted, it paid dues to the Brewers Association commensurate to its limited production: 0 to 500 barrels per year.[43] However, Respondent sells **less** than 75% of its beer off site. In its discovery responses, it declares that "For the current year the

---

[39] Petitioner's NOR, ex. 49, 10 TTABVUE 343 (brewersassociation.org/statistics-and-data/national-beer-stats/).

[40] Petitioner's NOR, ex. 50, (brewersassociation.org) 10 TTABVUE 349.

[41] Petitioner's NOR, ex. 62, "What is the Difference Between a Craft Brewery and a Microbrewery?" (craftbeerclub.com/blog) 10 TTABVUE 414.

[42] Petitioner's NOR, Respondent's Ans. to Int. 8: "Registrant does produce less than 15,000 barrels of beer per year," 10 TTABVUE 265; Respondent's Response to Request for Admission no. 12, admitting that Respondent produces fewer than 15,000 barrels of beer per year. 10 TTABVUE 193.

[43] Petitioner's NOR, ex. 43, 10 TTABVUE 312.

percentage of Registrant's beer that is sold 'off-site' to retailers or sold 'onsite' for off-site consumption is 53%."[44]

For this sole reason—its low percentage of beer sales off-site—Respondent maintains that it is not a microbrewery.[45] As it states in answer to one of Petitioner's interrogatories:

> **INTERROGATORY NO. 34**: The Brewers Association defines a "microbrewery" as a brewery that produces fewer than 15,000 barrels of beer per year and sells 75 percent or more of its beer off-site. If you contend that Respondent does not meet this definition of "microbrewery," state the facts that support such contention.
>
> **RESPONSE TO INTERROGATORY NO. 34**: Registrant objects to this Interrogatory as irrelevant and not likely to lead to the discovery of relevant information. Subject to the General Objections and Qualifications listed above, Registrant responds that it does not meet the requirements for being considered a "microbrewery" by the Brewers Association, at least because it does not sell 75% or more of its beer off-site.[46]

Before Petitioner initiated this proceeding, Respondent's website stated that it was a microbrewery: "Bull Creek is a production micro-brewery and not a brewpub

---

[44] Respondent's Ans. to Int. 10, 10 TTABVUE 266.

[45] "Registrant does not qualify as a microbrewery. In particular, Registrant does not sell 75% or more of its beer off site. Thus, an application of the modifier 'micro-brewed' to Registrant's goods would be an incorrect description of Registrant and Registrant's beer and is erroneous under Petitioner's own adopted definition for the term." Respondent's brief, 25 TTABVUE 17-18.

[46] Respondent's Ans. to Int. 34, 10 TTABVUE 276. *See also* Matthys decl. ¶ 31, 16 TTABVUE 9 ("Under the paradigm set forth by the Brewers Association, Bull Creek Brewing does not qualify as a Microbrewery. ln particular, Bull Creek Brewing does not sell 75 percent or more of its beer off-site.").

as distinguished by Texas State law."[47] Respondent admits that "at the time the Petition in this matter was filed, the website at bullcreekbrewing.com identified Respondent as a 'micro-brewery.'"[48] Petitioner further avers that "Respondent continued to identify itself as a 'micro-brewery' until well after this proceeding was filed" on February 15, 2022.[49]

Respondent protests that "the contents of the website at bullcreekbrewing.com were edited to remove reference to a 'micro-brewery' as Registrant's brewery no longer qualified as a 'micro-brewery' according to the definition of a 'microbrewery' as set forth by the Brewers Association."[50] Moreover, Respondent insists, "there is no standard definition in the field of a 'micro-brewery.'"[51]

Petitioner answers that the Brewers Association "definition is an outlier and the off-site sales requirement does not reflect consumers' understanding of the meaning of 'micro-brewery' but rather reflects an industry technicality with [which] consumers are not likely to be familiar."[52]

---

[47] Ex. 45, 10 TTABVUE 316-17 (June 18, 2021 webpage capture retrieved via Archive.org). Petitioner's NOR, ex. 36, Respondent's Response to Request for Admission no. 7, 10 TTABVUE 192.

[48] Petitioner's NOR, ex. 36, Respondent's Response to Request for Admission no. 6, 10 TTABVUE 192.

[49] Petitioner's reply brief, 26 TTABVUE 11.

[50] Respondent's Ans. to Int. 27, 10 TTABVUE 273.

[51] Respondent's Ans. to Int. 24, 10 TTABVUE 272.

[52] Petitioner's reply brief, 26 TTABVUE 11.

Petitioner adds: "The Brewers Association now defines Respondent as a 'taproom brewery,' as shown on Respondent's listing in The Brewers Association member directory. *See* NOR, Exh. 44 (10 TTABVUE 314). The Brewers Association defines a 'taproom brewery' as a 'professional brewery that sells 25% or more of this beer on-site and does not operate significant food services. The beer is brewed primarily for sale in the taproom, and is often dispensed directly from the brewery's storage tanks. Where allowed by law, taproom breweries often sell beer to-go and/or distribute to off-site accounts.' Petitioner submits that

Instead, Petitioner maintains, the question is whether relevant consumers have an understanding of what a term means; the Board has routinely found that dictionary definitions, journals, newspapers, and other publications suffice to show the relevant purchasing public's understanding of a particular term.[53] To this end, Petitioner cites dictionaries and other sources, most of which primarily define a "microbrewery" in terms of its limited output:

- "A small brewery, generally producing fewer than 15,000 barrels of beer and ale a year and frequently selling its products on the premises."—American Heritage Dictionary.[54]

---

limiting the [4565000] Reg. to "taproom brewed craft beer" would avoid a likelihood of confusion for the same reasons that limiting the [4565000] Reg. to "micro-brewed craft beer" would avoid a likelihood of confusion." Petitioner's brief, 24 TTABVUE 11 n.34.

Respondent responds: "Bull Creek Brewing appears categorized as a Taproom Brewery in the Brewers Association publications; however, Bull Creek Brewing does not qualify as a Taproom Brewery as defined, because it does not dispense beer directly from storage tanks for consumption in the taproom." Matthys decl. ¶ 31, 16 TTABVUE 9.

The issue framed by the pleadings and the record is whether Respondent's goods can be characterized as "micro-brewed craft beer," not whether Respondent could be characterized as a "taproom." *See* Petition for Partial Cancellation, 1 TTABVUE. Nor do we regard this issue as having been tried by implied consent under Fed. R. Civ. P. 15(a)(2). Implied consent to the trial of an unpleaded issue can be found only where the nonoffering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue. Fairness considerations are paramount in assessing whether an issue has been tried by implied consent -- there must be an absence of doubt that the non-offering party is aware that the issue is being tried. *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.,* 2011 WL 2161071, at *3 (TTAB 2011), *aff'd,* 188 F. Supp. 3d 22 (D.D.C. 2016), *aff'd,* 743 F. App'x 457 (D.C. Cir. 2018); *see* TBMP § 507.03(b). Here, Petitioner did not move to amend its Petition for Partial Cancellation to plead that Respondent operates a taproom, and gave no indication that this evidence would be used in support of such a claim until it submitted its brief. For these reasons, we do not address this unpleaded issue.

[53] Petitioner's reply brief, 16 TTABVUE 7 (citing *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341 (Fed. Cir. 2001)).

[54] Petitioner's NOR, ex. 52, AHDictionary.com, 10 TTABVUE 357.

- "A brewery producing less than 15,000 barrels per year and usually concentrating on exotic or high quality beer."—Dictionary.com.[55]

- "a small brewery making specialty beer in limited quantities"—Merriam-Webster.[56]

- "A limited-production brewery, typically producing specialty beers and often selling its products only locally" —Lexico.com.[57]

- "The term [microbrewery] and trend spread to the US in the 1980s and was eventually used as a designation of breweries that produce fewer than 15,000 U.S. beer barrels (1,800,000 liters; 460,000 U.S. gallons) annually."—Wikipedia.[58]

- "Although the term is fading from use, the Brewers Association in the United States continues to define a microbrewery as a brewery producing less than 17,600 hi (15,000 US barrels) per year."—BeerAndBrewing.com.[59]

We acknowledge that those in the beer industry—brewers, distributors, and retailers—would be cognizant of the Brewers Association definition. The pertinent question, however, is how the relevant public, adults who purchase and consume alcoholic beverages, would perceive Respondent. This relevant public could include some aficionados familiar with industry standards, but it would also include consumers who are not particularly sophisticated. *See Somerset Distilling Inc. v. Speymalt Whisky Dist. Ltd.*, 1989 WL 274426, at *3 (TTAB 1989). These consumers would tend to see Respondent as it is: a brewer with an admittedly limited, small batch output. Under the dictionary definitions, that is the epitome of a microbrewery.

---

[55] Petitioner's NOR, ex. 54, Dictionary.com 10 TTABVUE 364.

[56] Petitioner's NOR, ex. 56, Merriam-Webster.com, 10 TTABVUE 374.

[57] Petitioner's NOR, ex. 58, Lexico.com,10 TTABVUE 383.

[58] Petitioner's NOR, ex. 61 wikipedia.org, 10 TTABVUE 395.

[59] Petitioner's NOR, ex. 60, BeerAndBrewing.com/dictionary 10 TTABVUE 392.

The issue to most of the relevant public is not the quality or craftsmanship of Respondent's beer, or the extent to which its beer is sold on-site or off-site, but rather its limited production, a fact Respondent concedes. Petitioner claims that this limited production is inconsistent with also offering distilled spirits. That is the gravamen of Petitioner's Section 18 claim, and the necessary focus of this case.

In the final analysis, based on the definitions of record, we find that members of the consuming public would tend to regard Respondent, in common parlance, as a craft microbrewery, and its goods as "micro-brewed craft beer." The central issue is whether this proposed restriction would avert a likelihood of confusion.

### E. Whether Petitioner's Proposed Restriction to "micro-brewed craft beer" Would Avoid a Likelihood of Confusion

"In order to succeed in restricting a registration by using the provisions of Section 18, the plaintiff or counterclaim plaintiff must show that the entry of the proposed restriction to the goods in the defendant's registration will avoid a finding of likelihood of confusion…." *Orange Bang v. Ole Mexican Foods*, 2015 WL 5675641, at *9.

To determine whether the proposed modification in this case would avoid a likelihood of confusion under Section 2(d), 15 U.S.C. § 1052(d), we analyze the evidence and arguments under the *DuPont* factors. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973), *cited in B&B Hardware, v. Hargis*, 575 U.S. at 144. In so doing, we consider each *DuPont* factor for which there is evidence and argument. *In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019). Only the *DuPont* factors of significance to the particular case need be considered in the

likelihood of confusion analysis. *Naterra Int'l, Inc. v. Bensalem*, 92 F.4th 1113, 1119 (Fed. Cir. 2024).

### 1. Similarity of The Marks

Under the first *DuPont* factor, we consider "[t]he similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *DuPont*, 476 F.2d at 1361.

Respondent's registered mark is IRON BALLS, and Petitioner's applied-for mark is . Petitioner argues that its added words "ENGINEERED ALCOHOL" and design element suffice to distinguish the marks.[60] The marks, however, are the same as they were when the Board affirmed the refusal to register Petitioner's mark in *In re Iron Balls Int'l*, Serial No. 87299536, 2019 WL 646091 (TTAB 2019), 17 TTABVUE 3-17. And there is no evidence that the proposed restriction would affect the relevant public's perception of the marks. Consequently, as we have noted, issue preclusion bars relitigation of the first *DuPont* factor. Still, for the sake of completeness, we go over the Board's prior decision on this factor.

As the Board correctly observed, Respondent's entire mark is IRON BALLS. "The most notable part of Applicant's [Petitioner's] mark is the wording IRON BALLS, which dominates Applicant's mark by standing out in very large lettering." *Id.* at *2. Likelihood of confusion has been found where the entirety of one mark is encompassed by another. *Id.* (citing, inter alia, *Wella Corp. v. Calif. Concept Corp.*, 558 F.2d 1019 (CCPA 1977) (CALIFORNIA CONCEPT and surfer design for men's

---

[60] Petitioner's brief, 24 TTABVUE 16; Petitioner's reply brief, 26 TTABVUE 22.

cologne, hair spray, conditioner and shampoo likely to cause confusion with the mark CONCEPT for cold permanent wave lotion and neutralizer)). *See also Coca-Cola Bottling Co. v. Joseph E. Seagram and Sons, Inc.*, 526 F.2d 556, 557-58 (CCPA 1975) (applicant's mark BENGAL LANCER for club soda, quinine water and ginger ale similar to BENGAL for gin).

Moreover, the Board noted, "[t]he marks are similar in that both marks contain the wording IRON BALLS, which is the first term (and most prominent in size) in Applicant's mark. The first term in a mark often dominates its overall impression." 2019 WL 646091 at *3 (citing inter alia *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372-73 (Fed. Cir. 2005) ("The presence of this strong distinctive term as the first word in both parties' marks renders the marks similar, especially in light of the largely laudatory (and hence non-source identifying) significance of ROYALE.")); *see also In re Detroit Athl. Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly significant because consumers typically notice those words first."). In addition, the Board found, IRON BALLS is a standard character mark, which may be displayed in the same lettering style as in Petitioner's mark. 2019 WL 646091, at *3. *See* Trademark Rule 2.52(a), 37 C.F.R. § 2.52(a).

The Board's reasoning in the prior decision anticipates Petitioner's attempts to distinguish the marks here:

> While we must consider the marks in their entireties, it is entirely appropriate to accord greater importance to the more distinctive elements in the marks than to the less distinctive elements in determining whether the marks are similar. *In re Nat'l Data Corp.*, 753 F.2d 1056, [1058] (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a

mark, provided the ultimate conclusion rests on consideration of the marks in their entireties."). When a mark comprises both words and a design, the words are normally accorded greater weight because they are more likely to be impressed upon a purchaser's memory and would typically be used by purchasers to request the goods or services. *See In re Viterra*, 671 F.3d 1358, [1362] (Fed. Cir. 2012).

*Id.* at *2.

As the Board found in the prior decision, the wording "ENGINEERED ALCOHOL" in Petitioner's mark is subordinate to IRON BALLS—subordinate in placement, subordinate in size, and subordinate in meaning, as the wording merely describes a feature of Petitioner's gin.[61] "Merely descriptive terms in a mark do little to distinguish one mark from the other. Thus, while we may not ignore ENGINEERED ALCOHOL in Applicant's mark, we find this wording to be subordinate to IRON BALLS." *Id.* at *3. *See Nat'l Data*, 753 F.2d at 1058 ("That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark . . . .").

As the Board concluded in the prior decision, Petitioner's and Respondent's marks are "similar in appearance, sound, meaning and commercial impression when the marks are considered in their entireties. The dominant wording of [Petitioner's] mark is the entirety of [Respondent's] mark and the additional characteristics of

---

[61] In Petitioner's pending suspended application, as in its prior appealed application, the Examining Attorney required Petitioner to disclaim "ENGINEERED ALCOHOL" as merely descriptive. Application Serial No. 97263328, Nov. 28, 2022 Office Action, Petitioner's NOR ex. 1, 10 TTABVUE 25. Before responding to that disclaimer requirement, Petitioner requested suspension of its current application pending disposition of this proceeding for partial cancellation. Application Serial No. 97263328, April 26, 2023 Response to Office Action. Nonetheless, as we determined in the prior appeal, the subject phrase is merely descriptive and subordinate to the dominant component of Petitioner's mark, IRON BALLS.

[Petitioner's] mark do little to change the similar appearance, sound, meaning and commercial impression caused by this shared wording." *Id.* at \*4. The first *DuPont* factor weighs in favor of a likelihood of confusion.

### 2.    Strength or Weakness of Respondent's IRON BALLS Mark

Under the fifth *DuPont* factor, we consider the fame or strength of Respondent's registered mark, and under the sixth *DuPont* factor we consider the extent to which that strength may be attenuated by "[t]he number and nature of similar marks in use on similar goods." *DuPont*, 476 F.2d at 1361.[62] A mark's strength varies along a spectrum from very strong to very weak. *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 1325 (Fed. Cir. 2017). The mark's placement along that spectrum affects the scope of protection to which it is entitled. *Monster Energy Co. v. Lo*, 2023 WL 417620, at \*9 (TTAB 2023), *civ. action filed*, No. 5:23-cv-00549-GW-PVC (C.D. Cal. Mar. 28, 2023).

"There are two prongs of analysis for a mark's strength …: conceptual strength and commercial strength." *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1362 (Fed. Cir. 2023). "Conceptual strength is a measure of a mark's distinctiveness, and distinctiveness is often classified in categories of generally increasing distinctiveness[:] … (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Id.* (cleaned up). "Commercial strength, on the other hand, is the

---

[62] Generally, under the fifth and sixth *DuPont* factors, we consider the strength or weakness of the plaintiff's mark. In this case, though, where the plaintiff/Petitioner seeks to avoid a likelihood of confusion by restricting defendant/Respondent's goods under Section 18, we focus on the defendant's mark.

marketplace recognition value of the mark." *Id*. at 1363 (internal citation and punctuation omitted).

Petitioner argues that Respondent's admittedly limited production of "micro-brewed craft" beer renders its IRON BALLS mark commercially weak. Specifically, Petitioner argues that Respondent "produces only approximately 200 barrels of beer a year, of which only a fraction bears Respondent's Mark. It has never been sold outside of Texas."[63] This argument is unpersuasive. Under the fifth *DuPont* factor, "the fame of a registered mark is relevant to likelihood of confusion, *DuPont*, 476 F.2d at 1361… (factor five)." *In re Majestic Distilling Co.*, 315 F.3d 1311, 1317 (Fed. Cir. 2003). The Federal Circuit, however, has expressly declined to "establish the converse rule that likelihood of confusion is precluded by a registered mark's not being famous." *Id.* Accordingly, even if the distribution of Respondent's beer has not been widespread, that has "little probative value" in the strength analysis.

Respondent points out that it obtained its registration for IRON BALLS "on July 8, 2014, and has used its mark in commerce in connection with beer since at least May 20, 2014, or for over nine years. Registrant's mark is incontestable."[64] But Petitioner correctly responds that the registered mark's incontestable status does not render it commercially strong. *See In re Fat Boys Water Sports LLC*, 2016 WL 3915986, at *9 n.25 (TTAB 2016).

On the other hand, Petitioner has not introduced evidence of third-party registrations or use of similar marks for similar goods. *See Monarch Wine Co. v. Hood*

---

[63] Petitioner's brief, 24 TTABVUE 15. *See* Petitioner's NOR ex. 65, 10 TTABVUE 459, Respondent's Ans. to Int. 11, 13, 10 TTABVUE 266-67.

[64] Respondent's brief, 25 TTABVUE 16-17.

*River Dist., Inc.*, 1977 WL 22627, at *2 (TTAB 1977) ("While applicant contends that 'MONARCH' is a weak mark, and, therefore, can be afforded only a limited or narrow scope of protection, there is no evidence of record to indicate that the designation 'MONARCH' is a common or 'weak' term as far as its use in association with products in the alcoholic beverage field is concerned."). Consequently, Petitioner has not shown that Respondent's mark is "weak" in the sense used in the sixth *DuPont* factor—that is, showing that similar marks in use on similar goods have diffused its distinctiveness and enabled the relevant consuming public to distinguish it from other marks based on minute differences. *Palm Bay*, 396 F.3d at 1374 ("The purpose of a defendant introducing third party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different such marks on the bases of minute distinctions."), *quoted in Syndicat Des Proprietaires Viticulteurs De Chateauneuf-Du-Pape v. Pasquier DesVignes*, 2013 WL 5407284, at *11 (TTAB 2013).

Conceptually, we find that IRON BALLS is arbitrary as used on beer. *Palm Bay*, 396 F.3d at 1372 (arbitrary terms are conceptually strong trademarks). *See, e.g.*, *In re Bercut-Vandervoort & Co.*, 1986 WL 83681, at *3 (TTAB 1986) (PETRUS arbitrary for wine). The mark registered without a claim of acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f), so it is entitled to all of the presumptions under Section 7(b), 15 U.S.C. § 1057(b), including the presumption of inherent distinctiveness, i.e., that consumers will inherently associate it with a unique source. *See, e.g.*, *Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 17

F.4th 129, 146 (Fed. Cir. 2021). Its status as "micro-brewed craft" beer does not affect its conceptual strength.

In sum, given the arbitrary nature of IRON BALLS, Respondent's mark is conceptually strong, pointing to a unique source. *Palm Bay*, 396 F.3d at 1372. Petitioner has failed to establish that Respondent's mark is commercially weak, but even if the mark is not commercially strong, that does not appreciably affect the likelihood-of-confusion calculus. We find that Respondent's mark is entitled to the normal scope of protection to which inherently distinctive marks are entitled. *Sabhnani v. Mirage Brands, LLC*, 2021 WL 6072822, at *13 (TTAB 2021).

### 3.  Similarity of the Parties' Goods

The second *DuPont* factor concerns the "similarity or dissimilarity and nature of the goods or services as described in an application or registration," *DuPont*, 476 F.2d at 1361. In Section 2(d) cases, we usually compare the goods as they are identified in the parties' respective identifications. *Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd.*, 2015 WL 5316485, at *11 (TTAB 2015). But where, as here, a plaintiff seeks a restriction to the defendant's goods under Section 18 of the Trademark Act, we consider whether plaintiff's identified goods are related to the proposed restricted goods. *Orange Bang v. Ole Mexican Foods*, 2015 WL 5675641, at * 9.

In the prior decision, the Board stated that "Registrant's identification is not limited to craft beer; registrant's goods are considered to include all types of beer," and found those goods related to Petitioner's "gin." 2019 WL 646091 at *6, 17 TTABVUE 15. Petitioner contends that restricting Respondent's identification to

"micro-brewed craft beer" would render the parties' goods more dissimilar in the eyes of the purchasing public, thereby avoiding a likelihood of confusion.

Petitioner starts with the proposition that "[t]here is no per se rule that holds that all alcoholic beverages are related."[65] To the contrary, its witnesses maintain, "the alcoholic beverage industry is typically broken down into three primary … segments – beer, wine, and spirits – which typically remain quite separate."[66] "Beer and distilled spirits such as gin are also produced by different processes and methods," they declare.[67] "The equipment used to brew beer is different from the equipment used to distill spirits. Among other things, distillation requires a still that can be used to heat the fermented liquid and capture, separate, and condense the vapor."[68]

Petitioner's witnesses conclude that:

> [T]he effort put into developing a beer often does not translate to developing a spirit. Different vendors and suppliers are often required. Recipes and production methods are entirely different. A different distributor usually must be located. In short, it is an entirely different enterprise. For this reason, it is unusual for producers of beer to also get into the business of producing spirits.[69]

The prior Board decision found beer and gin commercially related based on third-party trademark registrations and websites adduced by the Examining Attorney showing both alcoholic beverages purveyed from the same source under the same

---

[65] Petitioner's brief, 24 TTABVUE 15 (citing *In re White Rock Distilleries Inc.*, 2009 WL 3401827, at *2 (TTAB 2009)).

[66] Ambrunn decl. ¶ 3, 8 TTABVUE 3; Bramaz decl. ¶ 3, 9 TTABVUE 2.

[67] Ambrunn decl. ¶ 6, 8 TTABVUE 3.

[68] Bramaz decl. ¶ 7, 9 TTABVUE 3; Ambrunn decl. ¶ 7, 8 TTABVUE 4.

[69] Ambrunn decl. ¶ 9, 8 TTABVUE 4; Bramaz decl. ¶ 9, 9 TTABVUE 4.

mark.[70] Petitioner targets that third-party evidence, noting that "[o]f the eight third-party trademark registrations cited in the prior Board decision, six have been cancelled in their entirety and one has been amended to delete all class 32 goods, including beer."[71] Furthermore, "[o]f the five websites cited in the prior Board decision – Treaty Oak, Warfield Distillery & Brewery, Bent Brewstillery, New Holland Brewing, and Dogfish Head Distilling Co. – at least one (for Treaty Oak Distilling) no longer references any beer or brewery services, and two are irrelevant because they do not refer to craft micro-breweries, but instead refer to large, regional craft breweries, namely, New Holland Brewing and Dogfish Head."[72]

Petitioner takes the position that large breweries, unlike small breweries, have the resources to branch out into distilling, and the consuming public knows that: "Consumers understand that smaller companies, such as micro-brewers, have less resources, and, as such, are less likely to expand into entirely different lines of business."[73]

Petitioner supports this position with the following statistics:

> As of 2021, the most recent year for which statistics were available, there were approximately 9,247 breweries in the United States. Of these, 129 were large/non-craft breweries, 223 were regional craft breweries with an annual production of between 15,000 and 6,000,000 barrels, and the rest—nearly 8,900—are smaller micro-breweries with production under 15,000 barrels a year.

---

[70] Prior Board decision, 2019 WL 646091 at 4-5, 17 TTABVUE 10-11. Prior Application Serial No. 87299536, April 10, 2017 Office Action, Respondent's NOR ex. 2, 19 TTABVUE 119-86.

[71] Petitioner's reply brief, 26 TTABVUE 17 (citing Petitioner's NOR ex. 66, 22 TTABVUE 7-10, 19-22, 34-35, 42-43, 46).

[72] Petitioner's reply brief, 26 TTABVUE 17-18 (citing Petitioner's NOR ex. 67, 22 TTABVUE 49-69; Petitioner's NOR ex. 65, 10 TTABVUE 454-55, 458).

[73] Petitioner's brief, 24 TTABVUE 14.

Of the seven third-parties the Trademark Office identified, three are large regional craft beer producers. The fact that large regional craft beer producers may also use their mark for "gin," does not support a finding that a much smaller micro-brewery would use the same mark for both "gin" and "beer."

And, even if each of the four other third-parties that the Trademark Office identified as using the same mark for both "gin" and "beer" were micro-breweries, that represents just four out of the approximately 8,900 such breweries in the United States. Viewed in the full context of the micro-brewed craft beer market, evidence that four micro-breweries – less than .05% of micro-breweries – also offer "gin," does not support a finding that "gin" and "micro-brewed craft beer" are related for likelihood of confusion purposes.[74]

Petitioner's witnesses attest that they have become aware of at most fifteen (15) breweries that may also produce distilled spirits, but contend that "[e]ven if 15 breweries are also offering distilled spirits, that number represents fewer than .2% of breweries in the United States." [75]

Given these statistics, Petitioner argues, "The average consumer is simply not likely to believe that a craft micro-brewery is also offering gin."[76]

Respondent responds that restricting its identification from "beer" to "micro-brewed craft beer" would not render the parties' goods more dissimilar in the eyes of the purchasing public. Respondent notes that almost all of the thousands of breweries in the United States—over 99 percent—are considered "small" under the definition

---

[74] Petitioner's brief, 24 TTABVUE 12-13. Petitioner's NOR, ex. 49, Brewers Association National Beer Sales Production Data, BrewersAssociation.org/statistics-and-data/national-beer-stats/ 10 TTABVUE 344 (number of breweries by type through 2021). The three breweries Petitioner characterizes as regional craft breweries are New Holland Brewing, Dogfish Head, and Rogue. Petitioner's NOR ex. 65, "The New Brewer" The Journal of the Brewers Association (statistics on domestic craft brewing companies and regional brewing companies) 10 TTABVUE 454-55, 458.

[75] Ambrunn decl. ¶ 10, 8 TTABVUE 4-5; Bramaz decl. ¶ 10, 9 TTABVUE 4.

[76] Petitioner's reply brief, 26 TTABVUE 23.

set forth by the Brewers Association.[77] The small brewers' beers, including Respondent's, are regularly sold in liquor stores, bars, and restaurants alongside beers from large-scale producers.[78] At these retail sites, Respondent contends:

> As a product, a beer produced by a smaller-sized brewer is indistinguishable from a beer produced by a larger-sized brewer. Beer is simply, beer, in particular, an alcoholic drink made from yeast-fermented malt and hops. Producers of any size can and do make beer of varying flavor profiles based on varying proportions of ingredients, yet the product itself remains "beer."[79]

Respondent's witness avers that "It is not uncommon in the alcoholic beverage industry for breweries to also distill spirits…."[80] "Furthermore," he notes, "breweries already have *all* equipment necessary to make the mash that can be used to produce liquor. Liquor production requires only the addition of a still to common brewery equipment. A still can be easily purchased."[81]

The third-party evidence in the prior Board decision did not purport to be exhaustive of all entities in the United States that produce both beer and gin, Respondent notes, and "does not account for entities that produce both beer and spirits other than gin…."[82] Respondent posits that "The existence of such entities contributes to the perception in the marketplace that beer and spirits are produced by common entities. Furthermore, entities that both brew beer and distill spirits are

---

[77] Matthys decl. ¶ 32, 16 TTABVUE 9 (citing April 26, 2022 Department of the Treasury report on the "NUMBER OF BREWERS BY PRODUCTION SIZE -CY 2021", Respondent's NOR ex 8, 17 TTABVUE 108.

[78] Matthys decl. ¶¶ 6, 14, 16 TTABVUE 3, 5.

[79] Matthys decl. ¶ 21, 16 TTABVUE 6.

[80] Matthys decl. ¶ 26, 16 TTABVUE 7.

[81] Matthys decl. ¶ 28, 16 TTABVUE 8.

[82] Respondent's brief, 25 TTABVUE 15.

becoming increasingly common. Such entities are referred to as 'brewstilleries' and encompass breweries of all sizes."[83] To illustrate, it points to:

- **Schitz Creek Distillery/Brewer**—which advertises "a variety of spirits distilled from grains grown right here in Texas" as well as "10 craft beers on tap all made on location…."[84]
- **"The Brewstillery Movement" article**—which states that "[b]reweries and distilleries use equipment that is very similar for the production of beverage alcohol. Fermenters, pumps, hoses, yeast, mash tuns, lauter tuns, and fermenters are common tools utilized by both distillers and brewers. Some breweries have capitalized on this opportunity and co-utilize their equipment and expand into distillery operations."[85]
- **"Turning Beer Into Whiskey Distiller" Blog**—which states that "[a]ll whiskey is made, in essence, from beer. Distiller's beer, that is. It is a fundamental stage of the step-by-step process in which grains are turned into our beloved water of life. Today, more distillers are using actual beer.

  …

  In fact, in the craft world today, there's a growing number of 'brewstilleries'. These companies produce both beer and spirits, affording them the opportunity of using the former to make the latter.

  …

  Elsewhere, Catoctin Creek Distillery partnered with Virginia neighbor Heritage Brewing for a limited edition Kings Mountain single malt release. They started with Heritage's Kings Mountain Scotch Ale, and then aged the resulting distillate for a year in barrels that the brewery had already used. The resulting whiskey was filled with hops, malt, zest, and spice; basically a beer whittled down to its essence with an added kick. Which is indeed what i[t] was, and that's why these experimental releases are so fun when they're executed properly.

  In New Jersey, Cooper River Distillers has produced an entire lineup of limited edition whiskeys made from local breweries. This includes half a dozen from Philadelphia's Saint Benjamin Brewing, such as their Single Run St.

---

[83] Respondent's brief, 25 TTABVUE 15-16 (citing Respondent's NOR, Exs. 9-11, 17 TTABVUE 110-28).

[84] ThirstyMule.com, Respondent's NOR ex. 9. 17 TTABVUE 110.

[85] Beverage-Master.com/2022.02/the-brewstillery-movement/, article written by Kris Bohn, owner of Distillery Now Consulting LLC, "helping folks build distilleries". Respondent's NOR ex. 10. 17 TTABVUE 112-20.

Benjamin's IPA, along with collaborations with Tuckahoe Brewing and Flying Fish Brewing.

With all of the talent toiling away in America's thousands of craft breweries and distilleries, and the increasing convergence between those two realms, expect much more in this realm in the years ahead."[86]

Petitioner objects that Respondent's printout from a website advertising Schitz Creek Distillery & Brewery is inadmissible, as it lacks a URL and the date the materials were accessed.[87] Respondent, however, provided the URL in its Notice of Reliance.[88] Respondent did not provide the date it downloaded the website, but Petitioner did not raise this procedural shortcoming earlier, when it could have been cured, and has thereby waived the objection. *See Shenzhen IVPS Tech. Co. v. Fancy Pants Prods., LLC*, 2022 WL 16646840, at *10 n.26 (TTAB 2022). The printout cuts off both sides of the page, but the relevant content is still legible.[89] Petitioner notes that "the printout does not show a craft micro-brewery that also offers gin; at best it shows a craft micro-brewery that offers other distilled spirits."[90] We find the printout relevant to that extent.

Petitioner contends that the Board's prior decision is inadmissible to the extent it is being offered to prove the existence of the eight third-party registrations and five third-party websites showing entities operating both breweries and distilleries.[91]

---

[86] Distiller.com/articles/beer-distilled-whiskey Sept. 15, 2016, 6/5/2023, Respondent's NOR ex. 11, 17 TTABVUE 122-28.

[87] Petitioner's reply brief, 26 TTABVUE 16.

[88] Respondent's NOR ¶ 10, at 15 TTABVUE 4-5.

[89] Respondent's NOR ex. 9. 17 TTABVUE 110.

[90] Petitioner's reply brief, 26 TTABVUE 16.

[91] *Id.* at 16-17.

However, the third-party registrations and websites that the Board addressed in the prior decision were also made of record in this case,[92] as was Petitioner's evidence purporting to show that some of the registrations were cancelled and that one of the websites, for Treaty Oak, no longer advertises beer.[93] Consequently, Petitioner's objection is not well-taken, as this evidence shows the change in circumstances, vel non, between the prior and present decisions.

Petitioner contends that the two articles cited by Respondent, "The Brewstillery Movement" and "Turning Beer Into Whiskey Distiller Blog,"[94] are inadmissible hearsay to the extent they are offered to prove the truth of the statements therein.[95] The articles show on their face that their readers were exposed to articles about breweries either operating "brewstilleries" themselves or collaborating with distilleries to produce distilled spirits in addition to beer. They are accordingly relevant and admissible to that extent. *Spiritline Cruises LLC v. Tour Mgmt. Svcs., Inc.*, 2020 WL 636467, at *3 (TTAB 2020).

Petitioner's remaining objections go to the weight of the evidence.[96] We understand that Respondent's witness, Erick Mathys, is one of Respondent's co-founders, just as Petitioner's witnesses, Messrs. Ambrunn and Bramaz, are two of its principals.[97] "We therefore overrule [the] objections to the testimony, but will weigh

---

[92] Respondent's NOR ex. 2, 19 TTABVUE 119-86.

[93] Petitioner's NOR exs. 66-67, 22 TTABVUE 7-69.

[94] Respondent's NOR exs. 10-11, 17 TTABVUE 112-28.

[95] Petitioner's reply brief, 26 TTABVUE 17.

[96] Petitioner's reply brief, 26 TTABVUE 19.

[97] Ambrunn decl. ¶ 1, 8 TTABVUE 2; Bramaz decl. ¶ 1, 9 TTABVUE 2.

its relevance, what foundation was laid for the testimony [and other evidence], and its strength or weakness, including any inherent limitations therein." *Id*. at *5.

According all relevant evidence its proper weight, we turn now to the core issue: whether restricting Respondent's identification to "micro-brewed craft beer" would render the parties' goods dissimilar enough to avoid a likelihood of confusion. The measure of whether goods are related is determined from the point of view of consumers of the respective goods. *Recot Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000) ("[E]ven if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis.").

Petitioner contends that the restrictive language conforms to Respondent's actual use, and that smaller breweries like Respondent are less likely than large breweries to branch out into distilled spirits. Petitioner's position presupposes that consumers (1) view Respondent's IRON BALLS beer as the product of a small producer, and (2) would be unlikely to believe that such a small producer would also produce a similarly-branded distilled spirit, such as gin.

This assumes too much. Despite Petitioner's statistics, "[t]here is no requirement for goods to be found related that all or even a majority of the sources of one product must also be sources of the other product." *In re Kysela Pere et Fils Ltd.*, 2011 WL 1399224, at *3 (TTAB 2011) (quoting *In re G.B.I. Tile and Stone Inc.*, 2009 WL 3491050, at *6 (TTAB 2009)). "Indeed, goods can be related even if there is no evidence that any entity, much less the applicant or registrant, is the source of both

applicant's and registrant's goods." *Id*. at *7 (citing *Majestic Distilling*, 315 F.3d at 1315-16).

In *Majestic Distilling*, the applicant argued that "malt liquor is a brewed product, whereas tequila is distilled," but the Federal Circuit Court of Appeals found that:

> [M]alt liquor and tequila are similar by virtue of the fact that both are alcoholic beverages that are marketed in many of the same channels of trade to many of the same consumers. Although the PTO apparently found **no evidence of any manufacturer who both brews malt liquor and distills tequila**, Majestic has not shown that the PTO's lack of evidence in that regard is relevant. **Unless consumers are aware of the fact,** if it is one, that no brewer also manufactures distilled spirits, that fact is not dispositive. … In this case, **Majestic has not demonstrated that consumers distinguish alcoholic beverages by manufacturer rather than brand name**.

*Majestic Distilling*, 315 F.3d at 1316 (emphasis added).

So too here. Consumers encountering Respondent's IRON BALLS beer and Petitioner's similarly-branded gin in liquor stores or other channels of trade are unlikely to be aware of the size of the alcoholic beverages' manufacturers (brewers and distillers), or of industry statistics demonstrating the frequency with which one produces the other libation. Nor are they likely to be aware that some companies making beer and distilled spirits are, in Petitioner's words, "large, regional craft breweries" rather than craft microbreweries.[98] "Rather, it is sufficient that the goods are related in some manner, or that the circumstances surrounding their marketing are such that they would be likely to be encountered by the same persons in situations that would give rise, because of the marks used thereon, to a mistaken belief that they originate from or are in some way associated with the same source or that there

---

[98] Petitioner's reply brief, 26 TTABVUE 18.

is an association or connection between the sources of the respective goods." *In re White Rock Distilleries*, 2009 WL 3401827, at \*2; *see also Anheuser-Busch v. Innvopak*, 2015 WL 5316485, at \*14 ("The question is whether, under all the circumstances, consumers encountering the goods sold under these marks would mistakenly believe that they share or are affiliated with or sponsored by a common source.") (wine related to beer); *Joel Gott Wines, LLC v. Rehoboth Von Gott, Inc.,* 2013 WL 5407313, at \*8 (TTAB 2013) ("The goods need only be sufficiently related that consumers would be likely to assume, upon encountering the goods under similar marks, that the goods originate from, are sponsored or authorized by, or are otherwise connected to the same source.").

Petitioner's proposed restriction to "micro-brewed craft beer" does not affect the nature of the beer Respondent produces; it simply means that it is provided by a small producer. But that does not impose a meaningful limitation for purposes of likelihood of confusion analysis. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 1322-23 (Fed. Cir. 2017).

Even with the restriction, an average consumer encountering Petitioner's and Respondent's similarly-branded alcoholic beverages in overlapping channels of trade could still mistakenly assume that the goods had a common origin. *Joel Gott Wines,* 2013 WL 5407313 at \*10 ("Purchasers of opposer's GOTT and JOEL GOTT wines are likely to assume that applicant's goods, sold under the mark GOTT LIGHT and design, are merely a line extension of goods emanating from opposer."). Here, because Petitioner's mark adds "engineered alcohol" to IRON BALLS, "[t]hose consumers who do recognize the differences in the marks may believe that applicant's mark is a

variation of opposer's mark that opposer has adopted for use on a different product." *Schieffelin & Co. v. The Molson Cos.*, 1989 WL 277823, at *4 (TTAB 1989).

Alternatively, the average consumer could assume that there was an association or connection between a brewer and a distiller. *Cf. In re Save Venice N.Y., Inc.*, 259 F.3d 1346, 1355 (Fed. Cir. 2001) ("The related goods test measures whether a reasonably prudent consumer would believe that noncompetitive but related goods sold under similar marks derive from the same source, or are affiliated with, connected with, or sponsored by the same trademark owner"). For example, in a case involving whiskey and beer producers using similar marks, the Court held:

> It is not material whether [the average purchaser] would think that the makers of the Scotch whisky were actually brewing and bottling this beer, or whether it was being produced under their supervision or pursuant to some other arrangement with them. [The average purchaser] would probably not concern himself about any such detail.

*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963), *cited in United Rum Merchants Ltd. v. Fregal, Inc.*, 1982 WL 52025, at *4 (TTAB 1982).

Relatedness may arise from this type of association or connection, even if brewers may encounter some difficulties branching out into distilling. One of Respondent's articles, "The Brewstillery Movement," describes the different regulatory, licensing, bookkeeping and tax issues distillers face.[99] But another article, "Turning Beer Into Whiskey," describes how breweries can collaborate with existing distilleries, thereby

---

[99] Beverage-master.com/2022/02/the-brewstillery-movement/ Respondent's NOR ex. 10, 17 TTABVUE 112-16.

avoiding those issues.[100] So in this case, as in *Fleischmann*, the average consumer encountering the parties' similarly-branded alcoholic beverages in the same channels of trade could assume, mistakenly, that there was an association or connection between Respondent, a brewer, and Petitioner a distiller.

In sum, despite Petitioner's proposed restriction to Respondent's goods, the second *DuPont* factor, relatedness of the goods, weighs in favor of a likelihood of confusion.

### 4. Trade Channels, Classes of Customers, and Their Sophistication and Care

The third *DuPont* factor concerns "[t]he similarity or dissimilarity of established, likely-to-continue trade channels," and the fourth factor concerns "[t]he conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 476 F.2d at 1361.

The third factor "must be evaluated with an eye toward the channels specified in the application and registration, not those as they exist in the real world." *In re Detroit Athl.*, 903 F.3d at 1308. The prior Board decision found an overlap in trade channels and customers for Petitioner's identified goods, "gin," and Respondent's "beer." 2019 WL 646091 at *5. The issue before us now is whether restricting Respondent's goods to "micro-brewed craft beer" would reduce or negate this overlap. *See Eurostar,* 1995 WL 231387, at *6-7.

Petitioner's proposed restriction would not change the class of customers for the parties' goods: adult members of the general public who purchase and consume alcoholic beverages. The restriction adds the modifier "micro-brewed craft" before

---

[100] Distiller.com/articles/beer-distilled-whiskey Sept. 15, 2016, 6/5/2023, Respondent's NOR ex. 11, 17 TTABVUE 122-28.

"beer," but sets no further express limitations on Respondent's trade channels.

Absent express limitations, the parties' goods are presumed to travel in all normal and usual channels of trade for those goods. *Id.* (citing *In re i.am.symbolic,* 866 F.3d at 1327); *Anheuser-Busch v. Innvopak*, 2015 WL 5316485, at *11 (wine and beer); *Schieffelin v. Molson*, 1989 WL 277823, at *4.

Petitioner contends:

—That small craft breweries use different distributors than large breweries and spirits companies.[101]

—That while micro-brewed craft beer may be sold in some retail stores, it is more likely to be sold to consumers directly by the brewery and more likely to be limited to local retailers.[102] For example, "Respondent, a craft microbrewery, sells more than 70% of its beer on its premises, sells IRON BALLS beer in fewer than 175 retailers, sells its beer only in Texas, sells almost entirely within the Austin metropolitan area, and advertises in local Austin area publications."[103]

—That some grocery stores, bars and restaurants are licensed to sell beer but not spirits.[104]

—That while they may be sold in some of the same locations, micro-brewed craft beers and gin are typically located in separate, easily distinguished sections of stores and are also typically listed in different sections of menus.[105]

We agree with Respondent, however, that Petitioner's proposed restriction on Respondent's goods would not appreciably reduce the overlap in the parties' channels

---

[101] Petitioner's brief, 24 TTABVUE 15; Declaration of Romain Ambrunn, Director and Partner at Petitioner Iron Balls International Ltd., ¶ 7, 8 TTABVUE 4.

[102] Petitioner's brief, 24 TTABVUE 15.

[103] Petitioner's reply brief, 26 TTABVUE 20.

[104] Ambrunn decl. ¶ 4, 8 TTABVUE 3; Declaration of Philippe Bramaz, partner and shareholder in Petitioner Iron Balls International, ¶ 4, 9 TTABVUE 2-3.

[105] Petitioner's brief, 24 TTABVUE 15; Ambrunn decl. ¶ 5, 8 TTABVUE 3; Bramaz decl. ¶ 5, 9 TTABVUE 3.

of trade. Even if the parties use different distributors, the normal retail outlets would continue to overlap in large part.

As Respondent's co-owner and co-founder avers:

Gin and beer, including Registrant's beer, are alcoholic beverages that are sold through multiple, identical channels of trade (e.g., liquor stores, restaurants, and bars) and purchasers of these products (e.g., members of the general public who consume alcohol) overlap.[106]

At present:

Registrant's beer has been sold in at least 172 retail outlets, including liquor stores, bars, and restaurants.[107] Bull Creek Brewing's beer, including its IRON BALLS beer, is regularly sold in liquor stores where gin and other spirits are also sold….[108]

Moreover, while Respondent's beer is limited in production, Respondent's involved registration is geographically unrestricted. *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1568 (Fed. Cir. 1983) (Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), creates a presumption that the registrant has the exclusive right to use its mark throughout the United States). Petitioner's proposed restriction would not prevent Respondent from expanding its channels of trade, adding liquor stores outside Texas, and advertising through other media. *In re Detroit Athl.*, 903 F.3d at 1308.

Furthermore, Petitioner's pending application for "gin" is also unrestricted, geographically or otherwise. So if its application matured into a registration, it could presumptively sell to the liquor stores, bars, and restaurants that carry Respondent's

---

[106] Respondent's brief, 25 TTABVUE 13; declaration of Erick Matthys, ¶ 22, 16 TTABVUE 7.

[107] Respondent's brief, 25 TTABVUE 13; Matthys decl. ¶ 5, 16 TTABVUE 3.

[108] Matthys decl. ¶¶ 6, 8-12, 16 TTABVUE 3.

goods, including those in Texas. *See Kangol Ltd. v. KangaROOS U.S.A., Inc.,* 974 F.2d 161, 164 (Fed. Cir. 1992) ("Yet, in neither the applicant's application nor the opposer's registrations are the trade channels in any way restricted."); *B.V.D. Licensing Corp. v. Rodriguez,* 2007 WL 616036, at *6 (TTAB 2007) (applicant could sell his goods in the same retail outlets as opposer).

Petitioner's argument that beer and spirits are segregated in liquor stores would apply to macro- as well as micro-brewed craft beers. Just as its argument failed in the prior Board decision, it fails here. An adult member of the consuming public could seek beer and liquor in a single shopping trip, and encounter both types of alcoholic beverages on that trip. *Schieffelin v. Molson,* 1989 WL 277823, at *4. ("A typical consumer of alcoholic beverages may drink more than one type of beverage and may shop for different alcoholic beverages in the same liquor store."). As the Board has observed, various types of alcoholic beverages travel in the same channels of trade, even if they are displayed on separate shelves: "We believe that a prospective purchaser of an alcoholic beverage upon entering and browsing through the various alcoholic products located or displayed on the various shelves or counters in retail liquor establishments would, upon encountering a whiskey, rum, brandy or vodka identified by the term 'MONARCH', and then continuing on [the purchaser's] jaunt to another counter or section of the same store and seeing a wine or champagne sold under the identical mark 'MONARCH', be likely to believe that both products originated with the same producer." *Monarch Wine v. Hood River,* 1977 WL 22627, at *3. Even if the types of beverage are separated in liquor stores, they would be close enough to engender confusion. As Respondent notes, "consumers are exposed to both

beer and spirits when purchasing alcohol at [liquor] stores, and it is not uncommon for nonrefrigerated beer to be placed on 'warm' shelves for display directly across from liquor displays."[109]

The same holds true for restaurant and bar sales. Respondent states that "[i]n addition to liquor stores, IRON BALLS beer has been sold at several bars and restaurants where it is offered on tap or by the bottle among other beers from producers of varying size including large-scale producers, and which restaurants often serve other types of alcoholic beverages, such wine and/or spirits."[110] If Petitioner were granted the geographically unrestricted registration it seeks, it could expand into these same restaurants and bars, where consumers would tend to order drinks verbally, without seeing labels, shortening their orders to the first, most memorable part of Petitioner's mark: IRON BALLS. *Schieffelin v. Molson*, 1989 WL 277823, at *4 ("We also take into consideration the fact that the products of the parties are of the type ordered verbally in bars and restaurants."); *In re Bay State Brewing Co.*, 2016 WL 1045677, at *3 (TTAB 2016) ("we also keep in mind the penchant of consumers to shorten marks.").

Simply put, Petitioner's proposed restriction of Respondent's identification to "micro-brewed craft beer" would not meaningfully reduce the overlap in the parties' channels of trade or classes of customers.

Petitioner argues that:

> Consumers of micro-brewed craft beers are often sophisticated. Craft-beers are often promoted to beer enthusiasts, and in particular, to local beer enthusiasts. These types of consumers are more likely to be more

---

[109] Respondent's brief, 25 TTABVUE 14; Matthys decl. ¶ 13, 16 TTABVUE 4-5.

[110] Matthys decl. ¶¶ 14, 16, 20, 16 TTABVUE 5-6.

sophisticated and knowledgeable both about craft beer in general, as well as about their local breweries. As a result, these consumers are less likely to be confused.[111]

The relevant public may consist of all types, in all kinds of settings. *See Somerset v. Speymalt*, 1989 WL 274426, at *3 ("While we realize that certain purchasers of alcoholic beverages may be aficionados and know not only 'their brands' but which companies make which trademarked products, we also realize that other consumers may not be as knowledgeable, and may purchase Scotch whisky, gin or vodka as gifts, or to stock a bar for their guests."); *see also In re Sailerbrau Franz Sailer*, 1992 WL 205049, at *2 (TTAB 1992) ("We do not agree with applicant that purchasers are necessarily discriminating. While some may have preferred brands, there are just as likely to be purchasers who delight in trying new taste treats. Furthermore, these are not expensive items requiring one to exercise careful thought and/or expertise in their purchase. More often than not they are shelf items which are purchased on a somewhat casual basis.").

Because the respective identifications do not set particular price points, we cannot presume that the consumers of the identified beverages, including micro-brewed craft beer, will be particularly sophisticated, discriminating, or careful in making their purchases, *Bercut-Vandervoort*, 1986 WL 83681, at *3, and the record does not reflect that the relevant consumers are sophisticated. *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 1371 (Fed. Cir. 2018) ("Attorney argument is no substitute for evidence.") (quoting *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005)). As always, we must base our decision on the least sophisticated potential

---

[111] Petitioner's brief, 24 TTABVUE 16.

purchasers. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 1325 (Fed. Cir. 2014).

Hence, the third *DuPont* factor weighs in favor of finding a likelihood of confusion, and the fourth *DuPont* factor is neutral.

### 5. Remaining *DuPont* Factors

The ninth *DuPont* factor considers "[t]he variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." *DuPont*, 476 F.2d at 1361.

Petitioner argues that "Respondent uses its mark only as the name of one of the numerous varieties of beer it offers under its house mark BULL CREEK BREWING, and a handful of promotional merchandise type items (e.g., t-shirts, signs, etc.). Petitioner seeks to register its mark only in connection with gin. Nor is there any evidence that either party intends to expand into the other's goods."[112] Respondent answers that it "has used its IRON BALLS mark in connection with at least two distinct styles of beer, including its Imperial Stout, flavored Stouts, and flavored Porters."[113]

In some cases, where the goods are not obviously related, the ninth *DuPont* factor may favor a finding that confusion is likely. *See generally Monster Energy v. Lo*, 2023 WL 417620, at *19. But in this case, "[g]iven the relatedness of the parties' identified goods, we find it unnecessary to rely on this factor." *Made in Nature, LLC v. Pharmavite LLC,* 2022 WL 2188890, at *32 (TTAB 2022).

We find the ninth *DuPont* factor to be neutral with respect to a finding of

---

[112] Petitioner's brief, 24 TTABVUE 16.

[113] Respondent's brief, 25 TTABVUE 13; Matthys Decl., ¶ 3 16 TTABVUE 3.

likelihood of confusion.

Under the twelfth *DuPont* factor (whether the potential for confusion is de minimis or substantial), Petitioner argues that "[b]ecause micro-brewed craft breweries are smaller, and have more local distribution, the potential for confusion is reduced."[114] However, "we find that the goods involved here are the type of goods that would be marketed to and purchased by significant numbers of purchasers [adults who purchase and consume alcoholic beverages], and that the potential for confusion therefore cannot be deemed to be de minimis." *In re Davey Prods. Pty Ltd.*, 2009 WL 2420527, at *9 (TTAB 2009). The twelfth *DuPont* factor is neutral, at best.

## IV.   Summary

On consideration of all the relevant *DuPont* factors, we find that Petitioner's proposed restriction of Respondent's identification of goods from "beer" to "micro-brewed craft beer" would not avoid a likelihood of confusion.

Respondent's registered mark, IRON BALLS, is arbitrary and conceptually strong. Petitioner's mark comes too close, appropriating IRON BALLS as the most prominent, dominant part of its mark. As the Board found in the prior ex parte appeal, the marks are similar, weighing in favor of finding a likelihood of confusion. Gin and "micro-brewed craft beer" would travel through overlapping channels of trade to a broad class of customers—some of whom may not be particularly sophisticated—who could well perceive the parties' goods as related. This also weighs in favor of finding a likelihood of confusion. The remaining *DuPont* factors are neutral. *See generally In re Charger Ventures LLC*, 64 F.4th 1375, 1383 (Fed. Cir.

---

[114] Petitioner's brief, 24 TTABVUE 16.

2023) (weighing *DuPont* factors).

For these reasons, even if Respondent's goods could be characterized as "micro-brewed craft beer," and even if its identification of goods were so restricted, the restriction would not avoid a likelihood of confusion. 15 U.S.C. § 1052(d).

**Decision:** The Section 18 petition for partial cancellation is denied.